UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

<table>
<tr><td>

MICHAEL GREGORY, individually and on behalf of all others similarly situated,

                                Plaintiff,

                        -v-

PRONAI THERAPEUTICS INC., NICK GLOVER, and SUKHI JAGPAL,

                            Defendants.
</td><td>

16 Civ. 8703 (PAE)

OPINION & ORDER
</td></tr>
</table>

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/13/2018

**PAUL A. ENGELMAYER, District Judge:**

In this putative class action under the federal securities laws, lead plaintiffs Michael Gregory, Yeshan Jagroo, and Mindy Frost (collectively, "plaintiffs") claim that pharmaceutical company ProNai Therapeutics Inc.[1] ("ProNAi"), its CEO and President Nick Glover ("Glover"), and its CFO Sukhi Jagpal ("Jagpal") (together, "ProNAi" or "defendants") made false and misleading statements touting the prospects of PNT2258, ProNAi's sole drug candidate. These statements were made between July 15, 2015, the day ProNAi's initial public offering prospectus was released, and June 6, 2016, the day ProNAi announced the discontinuation of development of PNT2258.

Plaintiffs bring this lawsuit on behalf of all persons who purchased ProNAi securities between July 15, 2015[2] and June 6, 2016 (the "Class Period"). They allege violations of

---

[1] On January 9, 2017, while this case was pending, ProNai changed its corporate name to Sierra Oncology, Inc. To avoid confusion, the Company here is referred to exclusively as ProNAi.

[2] At one point in the Amended Class Action Complaint, Dkt. 21 ("AC"), Lead Plaintiffs refer to the Class Period as beginning on July 16, 2015. AC at 55. Because the prospectus filing, which

§§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and the corresponding rule of the Securities and Exchange Commission, 17 C.F.R. § 240.10b-5 ("Rule 10b-5").

Pending now is ProNAi's motion to dismiss the Amended Class Action Complaint ("AC") for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b). For the following reasons, the Court grants the motion and dismisses the AC in its entirety.

## I.      Background[3]

After identifying the parties, the Court here sets out, at length, the chronology of events regarding PNT2258. This rendition is lengthy because plaintiffs allege that, during the Class Period, ProNAi made some 70 false and misleading statements, spanning a series of disclosures, and because the statements alleged to be actionable concern the status of PNT2258 at various points in its complex testing and development. As a general proposition, plaintiffs' core theory

---

triggered the start of this Class Period, was dated July 15, 2015, Dkt. 23, Declaration of Peter A. Stokes ("Stokes Decl.") Ex. 1 ("Prospectus") at 1, the Court assumes for purposes of this motion that the Class Period begins on July 15, 2015.

[3] These facts are drawn primarily from the AC. For the purpose of resolving the motion to dismiss, the Court assumes all well-pled facts to be true and draws all reasonable inferences in favor of plaintiffs. *See Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012). The Court also considered the documents attached to the Declaration of Peter A. Stokes in support of the motion to dismiss, Dkt. 23, and Stokes's Declaration in Further Support, Dkt. 29. Because these documents were incorporated into the AC by reference, or are matters of public record, they are properly considered on a motion to dismiss. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (in resolving a motion to dismiss, the court may consider, *inter alia*, "any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit") (citation omitted). The Court considered these documents "not for the truth of the matters asserted therein," but only "for the fact that the statements were made." *Clark v. Kitt*, No. 12 Civ. 8061(CS), 2014 WL 4054284, at *7 (S.D.N.Y. Aug. 15, 2014); *see also, e.g.*, *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) ("[I]t is proper to take judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents.").

is that ProNAi consistently overstated PNT2258's prospects, downplayed or failed to disclose historical and more recent negative test results, and identified as risk factors circumstances that had already come to pass. The 70 statements that plaintiffs claim to be actionable misstatements or omissions are listed chronologically in the Appendix to this decision. For ease of reference, they are identified there and here as misstatements ("MS") 1 through 70.

### A. Parties

ProNAi is "a clinical stage oncology company with a focus on pioneering a novel class of therapeutics based on its proprietary DNA interference (DNAi) technology platform." AC at 9. "Throughout the Class Period, PNT2258 (a DNAi drug) was the Company's only drug product candidate and, thus, the successful development of PNT2258 was critical to Pronai's long-term viability." *Id.*

The individual defendants are Glover, ProNAi's President and CEO and a member of its board since September 2014, and Jagpal, ProNAi's CFO since February 2015 (collectively, the "Individual Defendants"). *Id.* at 7–8.

The lead plaintiffs all purchased ProNAi securities during the Class Period. *Id.* at 6.

### B. Pre-Class Period Events

#### 1. PNT2258

During the Class Period, PNT2258 was ProNai's lead product candidate and the company's only drug in clinical development. *Id.* at 9, 11. It was developed based on ProNai's proprietary DNA interference (DNAi) technology platform. *Id.* at 11.

As ProNAi described DNAi technology, it is based on a discovery from "Wayne State University and Karmanos Cancer Institute that single-stranded DNA oligonucleotides can interact with genomic DNA" and interfere with gene transcription. *See* Prospectus at 82. The

theory is that those oligonucleotides could be used to interfere with the transcription of genes linked to particular diseases. ProNAi's Prospectus illustrated this concept as follows:



*Figure 1 (Prospectus at 82)*

As the Prospectus illustrated, ProNAi was to use pH-responsive lipid nanoparticles to protect the DNAi oligonucleotide and deliver them across physiological membranes to the cancer cells.

The drug in question here, PNT2258, was within the DNAi class. AC at 13. PNT2258 was designed to target a particular oncogene, BCL2, and interfere with its transcription. *Id.* at 11. BCL2 gives cancer cells the ability to resist the primary mechanism for the removal of damaged or unnecessary cells, known as apoptosis. *Id.* By effectively programming cancer cells to survive this naturally occurring process, an overexpression of BCL2 contributes to the formation, growth, and chemo-resistance of a wide range of tumors. *Id.*

PNT2258 was designed with the goal of restoring the apoptotic process and, thus, killing cancer cells. *Id.* PNT2258 contains two parts: (1) PNT100, the single-stranded DNAi oligonucleotide that was designed to target a particular regulatory region of BCL2 to limit

transcription, and (2) the protective lipid nanoparticles that allow PNT100 to travel to the cancer

cell's nucleus so that it can modulate gene transcription. *See* Prospectus at 85.

**The Design of PNT2258 Comprises Two Components**



*Figure 2 (Prospectus at 83)*

Defendants, during the Class Period, developed PNT2258 as a therapy for medical

conditions "DLBCL" and "RCLL." "DLBCL is a cancer of B cells, a type of white blood cell

responsible for producing antibodies. It is the most common type of [non-Hodgkins lymphoma]

among adults, accounting for about 30 percent of newly diagnosed cases in the United States. It

occurs primarily in older individuals and is an aggressive lymphoma that can arise in lymph

nodes or outside of the lymphatic system in the gastrointestinal tract, testes, thyroid, skin, breast,

bone, or brain." AC at 12. "RCLL [or Richter's CLL] is a transformation which occurs in about

5-10% of B cell chronic lymphocytic leukemia (CLL) and hairy cell leukemia into a fast-

growing DLBCL, which is refractory to treatment and carries a bad prognosis. Overall, the

median survival for RCLL patients is between five and eight months." *Id.*

## 2.      Clinical Trials[4]

In 2010, ProNAi conducted a dose-escalation, Phase 1 study of PNT2258.  *Id.* at 19.  The study was conducted on 22 patients with relapsed or refractory solid tumors.  *Id.*  This was a safety study, designed to determine appropriate dosing for future studies which would test the drug's efficacy.  *Id.*  It was open-label, meaning ProNAi could access and evaluate the trial data while the trial was ongoing.  *Id.*  Of the study's 22 patients, 19 had an "ECOG" performance scale rating of 1–2, which meant that they were "fully active or slightly restricted in strenuous activity but nevertheless ambulatory."  *Id.*[5]

On December 5, 2012, ProNAi disclosed results of the Phase 1 study at the annual Symposium on Molecular Targets and Cancer Therapeutics.  *Id.* at 20; Stokes Decl. Ex. 5.  Of the 22 patients participating in the trial, ProNAi disclosed, none reported a complete or partial response to the drug.  AC at 12.  One patient died within 30 days of beginning the trial.  *Id.*  Thirteen experienced a deterioration in condition.  *Id.*  Five did not experience any clinical benefit.  *Id.*  As to more specific data, however, ProNai, reported only pharmacokinetics data, that is, data regarding "the way in which drugs move through the body during absorption, distribution, metabolism, and excretion."  *Id.*  This data has implications for drug safety.  *Id.*  ProNAi did not report pharmodynamics data, meaning data regarding "the way in which drugs

---

[4] To avoid confusion, the Court, while providing background on these studies, does not recount in detail the public statements made by officials about these studies that predate the Class Period, as these statements are not at issue in this suit.

[5] A "0" ECOG score indicates that the patient is "fully active" and "able to carry on all predisease performance without restriction."  AC at 17.  A "1" indicates that the patient is "restricted in physically strenuous activity but ambulatory and able to carry out work of a light or sedentary nature."  *Id.*  A "2" indicates that the patient is "ambulatory and capable of selfcare but unable to carry out any work activities."  *Id.*  A "3" indicates that the patient is "capable of only limited selfcare" and is confined to a bed or chair more than 50% of waking hours.  *Id.*  A "4" indicates that the patient "cannot carry on any selfcare" and is "totally confined to [a] bed or chair."  *Id.*  A patient with a "5" is diseased.  *Id.*

[a]ffect the body, namely whether the drug dosed at the site of action has a resulting effect. *Id.* Such data has implications for drug efficacy. However, the Phase 1 study was designed to test "safety and tolerability," AC at 19, not efficacy.

In December 2012, ProNai began to enroll patients in its Pilot Phase 2 trial of PNT2258, which was also open-label and lacked a control group. The primary objectives of this trial were to continue to collect safety data and to determine PNT2258's "anti-tumor activity across several hematological malignancies." *Id.* at 21. The study enrolled 13 patients. *Id.* Of those 13, 12 patients had an ECOG performance scale rating of 0–1. *Id.* The 13th had a score of 2. *Id.* Approximately 77% of the enrolled patients had received two or fewer prior lines of therapy. *Id.*

On December 5, 2014, ProNAi announced interim efficacy results in a press release. *Id.* Four of the DLBCL patients responded to treatment. *Id.* at 23. Three had complete responses and the fourth had a partial response. *Id.* One RCLL patient had a complete response. *Id.*[6]

On December 28, 2014, based on the interim response of patients in the Pilot Phase II trial, ProNai began enrolling patients in its Wolverine Trial. *Id.* at 28. This decision to enroll patients in a new trial based on an interim response was, plaintiffs allege, a deviation from industry practice. *Id.* Like past trials, the Wolverine Trial was open and without a control group, features that plaintiffs again claim were at odds with industry practice. *Id.* at 26, 28.

According to the Amended Complaint, the primary objective of the Wolverine trial was "to characterize anti-tumor activity and collect safety data on approximately 60 patients with relapsed or refractory DLBCL." *Id.* at 29. The original inclusion criteria of the trial did not limit the number of individuals with prior therapies and indicated that the study would accept patients

---

[6] For patients with CLL, a complete response is a complete remission and a partial response is a partial remission.

with ECOG performance status of 0–2.  *Id.*  Ultimately 37 patients were enrolled in the study (which was ended prematurely).  *Id.*  Of those patients, 27% had either an ECOG performance status of 2 or had received four or more prior therapies.  *Id.*

On December 22, 2014, six days before the clinical trial started enrolling patients, ProNAi modified the Wolverine clinical design as follows:  The primary outcome measure, "disease control rate," *i.e.* "an endpoint that is durational in nature," was changed to become a secondary measure.  *Id.* at 30, 32.  The secondary measure, "overall response rate," was changed to be a primary outcome measure.  *Id.*  The "timeframe to measure both [was] extended from 4.5 to 6 months."  *Id.* at 30.  ProNAi also "add[ed] language that disease control rate and time to response and duration of response will be based upon a blinded independent imaging review."  *Id.*

The AC alleges that this and other amendments to the Wolverine trial were prompted by unspecified data that must have been known to ProNAi several months before it announced these amendments.  Plaintiffs infer this timeline from ProNAi's internal organization, as described by a confidential witness ("CW-4").  ProNAi, like all major pharmaceutical research companies, has an Internal Review Board ("IRB").  *Id.* at 36.  The IRB approves protocol amendments.  Further, CW-4, whom the AC describes as a former Senior Director of Biostatistics, has stated that, before a major protocol amendment can take effect, the Glover must sign off on it.  *See id.* at 36–37.  Extrapolating from the timelines ProNAi has disclosed for protocol amendments for other (later acquired) drugs, the AC alleges that as to PNT2258, this process would have taken at least a few months.  *See id.* at 37–38.  Thus, the AC alleges, ProNAi would have been aware several months before it amended the Wolverine protocols of whatever data motivated the adjustments.  *Id.* at 38.

The December 2014 protocol amendments were disclosed on the public website "ClinicalTrials.gov," apparently on the day they went into effect. *See* Stokes Decl. Ex. 11 ("Clinical Trials") at 5, 14–26.

### 3. Pre-Clinical Experiments

From October 2014 until February 2015, a confidential witness ("CW-1") in charge of crafting and carrying out "proof of concept" PNT2258 experiments at ProNai worked with two other scientists to discern PNT2258's mechanism of action. AC at 13. CW-1 has opined that their experiments suffered from a confounding variable: lipids. PNT2258 is a piece of DNA which is "composed inside of [a] lipid molecule." *Id.* at 14. According to CW-1, experiments involving PNT2258 should properly be run with a lipid control. *Id.* Otherwise, it is impossible to tell whether the observed effect was caused by the lipid or PNT2258. *Id.* At some point during this period, CW-1 was told by ProNai's Chief Science Officer that such a control was unnecessary because a lipid control "was not applicable to what happens in vivo." *Id.*

Between May 2015 and July 2016, beginning before the start of the Class Period but extending into it, a different confidential witness who was a ProNai research associate ("CW-2") conducted preclinical experiments to determine the mechanism of action for PNT2258. At unspecified times during this 14-month period, CW-1 and CW-2 have stated, they attended internal research meetings, occasionally attended by video by Glover, where "all the scientists reported the same conclusions—that DNAi and PNT2258 were ineffective." *Id.* at 15.

### C. The Class Period

### 1. July 15, 2015—Prospectus

On July 15, 2015, ProNai filed its offering prospectus with the Securities and Exchange Commission ("SEC"). Prospectus at 1.

### a. Past and Future Research

The Prospectus described at length ProNAi's past research into PNT2258's safety and efficacy and its planned research of the drug in the future. In particular:

*Phase I Trial*: The 2010 Phase I trial, according to the Prospectus, was designed to test the safety and tolerability of PNT2258, not its efficacy. Prospectus at 86. ProNAi disclosed that the trial "involved 22 patients with relapsed or refractory solid tumor malignancies" and that "patients were not chosen for participation on the basis of their BCL2 status, and, thus, overt evidence of antitumor activity was not expected." *Id.* ProNAi also disclosed that, at the conclusion of the trial, only six patients had a stable disease, and that none had had a partial or complete response to PNT2258. *Id.* at 87.

*Pilot Phase II Trial*: The 2012 Pilot Phase II trial, meanwhile, was described as a "single arm, open-label Phase 2 trial," which means, as discussed above, that the study was uncontrolled and the doctors had access to the study data as the trial was ongoing. The purpose of the study, as described in the Prospectus, was to evaluate the antitumor activity and safety of PNT2258. *Id.* at 88. As reported at this interim stage, 85% of patients had a complete response, partial response, or stable disease. *Id.* The Prospectus broke out which patients had which response. For example, of the four DLBCL patients, one had a partial response and the three others had a complete response. *Id.* at 89. According to the Prospectus "[a]lthough not statistically powered for a formal efficacy analysis, [ProNAi believes] the preliminary evidence of efficacy observed in this trial, coupled with safety and tolerability data collected to date, suggest[s] that PNT2258 has the potential to change treatment paradigms across a wide range of oncology indications." Prospectus at 77. The Prospectus also disclosed, through description and detailed charts, the drug-related adverse events experienced in the trial to date. *Id.* at 90.

*Wolverine Trial*:  The Prospectus also discussed the ongoing Wolverine Phase II trial as a trial that examined third-line relapsed or refractory DLBCL (*i.e.*, DLBCL in patients who had already experienced two failed treatments).  *Id.* at 91.  The trial was described as open label, and as one that would "identify and characterize patients who respond to PNT2258 on the basis of their genetic and disease characteristics" and collect safety data.  *Id.*  The Prospectus estimated that approximately 60 patients would be enrolled.  *Id.*  The Prospectus described the primary endpoint as overall response rate and the secondary endpoints as duration of response, disease control rate, progression-free survival, and more.  The Prospectus estimated that it would "be necessary to report safety and efficacy by mid-2016," and that, because the trial was open label, ProNAi anticipated "multiple clinical data read outs over the next 12 to 24 months."  *Id.*

*Brighton*:  The Prospectus also described the upcoming Brighton trial.  Brighton was to be an open label trial, according to the Prospectus, and was designed to study PNT2258 in patients with Richter's CLL.  *Id.* at 92.  More specifically, it was intended to "characterize anti-tumor activity and collect safety data on approximately 50 [RCLL] patients."  *Id.*

### b. Cautionary Disclosures

The Prospectus also contained 41 pages of cautionary disclosures.  *Id.* at 13–53.  These included the following:

- "Investment in oncology product development is highly speculative because it entails substantial upfront capital expenditures and significant risk that any potential product candidate will fail to demonstrate adequate efficacy or an acceptable safety profile . . . ."  *Id.* at 13.

- "We are very early in our development efforts and have only one product candidate in clinical development, which has only been tested in a limited number of patients. . . .  [T]he results of completed preclinical studies and early-stage clinical trials may not be indicative of the results from future clinical trials with a larger number of enrolled patients."  *Id.* at 14.

- "Clinical trials are expensive, difficult to design and implement, can take many years to complete and are uncertain as to outcome. Most product candidates that begin clinical trials are never approved by regulatory authorities for commercialization. We cannot, therefore, guarantee that we will be successful in obtaining the required efficacy and safety profile from the performance of any of our clinical programs. A failure of one or more clinical trials can occur at any stage of testing." *Id.* at 15.

- "[R]esponse rates from the use of our product candidates will likely not be sufficient to obtain regulatory approval unless we can also show an adequate duration of response." *Id.*

- "The outcome of preclinical testing and early clinical trials may not be predictive of the success of later clinical trials, and interim results . . . do not necessarily predict final results. To date, we have only obtained results from Phase 1 and Phase 2 clinical trials that are uncontrolled, involve small sample sizes and are of shorter duration than would be required for regulatory approval. Data from these clinical trials and our preclinical studies should not be relied upon as evidence that later or larger-scale, controlled clinical trials will succeed." *Id.*

- "For example, although the results from our Phase 2 trial of PNT2258 in patients with relapsed or refractory NHL characterized stable disease (SD) as providing evidence of antitumor activity, the FDA generally does not consider SD to provide a direct measure of antitumor activity. Accordingly, SD will likely not be a component of the primary efficacy endpoint of overall response rate of any pivotal trials necessary to obtain regulatory approval. There may be other reasons why our early clinical trials are not predictive of later clinical trials. For example, we have not discussed the design, including sample size, trial arms, duration and endpoints, or any results, of our completed, ongoing or planned clinical trials with the FDA, and thus we may not have the benefit of the FDA's current thinking on trial designs. In addition, the results of clinical trials in one set of patients or line of treatment may not be predictive of those obtained in other clinical trials, and protocols may need to be revised based on unexpected early results." *Id.*

- "Moreover, preclinical and clinical data are often susceptible to varying interpretations and analyses . . . . Many companies that have believed their product candidates performed satisfactorily in preclinical studies and clinical trials have nonetheless failed to obtain marketing approval of their products." *Id.*

- "We may be required to suspend, repeat or terminate our clinical trials if they are not conducted in accordance with regulatory requirements, the results are negative or inconclusive or the trials are not well designed." *Id.* at 24.

- "Our approach to the discovery of therapeutic treatments based on our DNAi technology platform is unproven and may not result in marketable products. . . . We believe we are the first to develop DNAi as a therapeutic modality to be tested

in humans. We may discover that our DNAi oligonucleotides do not possess the ability to hybridize to complementary regions of genomic DNA of an oncogenic target or our LNP delivery technology does not possess certain properties required for effective delivery . . . ." *Id.* at 27.

- "[T]he scientific research that forms the basis of our efforts to develop product candidates based on our DNAi technology platform is preliminary and limited." *Id.*

- "We will have broad discretion in the use of the net proceeds to us from this offering and may not use them effectively." *Id.* at 49. "We may also use a portion of the net proceeds to acquire, license and invest in complementary products, technologies or businesses . . . ." *Id.* at 55. The Company's intentions regarding the use of offering proceeds "could change in the future," including based on "the status of and results from clinical trials." *Id.*

### c.     Allegedly Actionable Statements in the Prospectus

Plaintiffs allege that the Prospectus's statements in the course of recounting the clinical trials about PNT2258's prospects were falsely and misleadingly positive, because the drug's prospects were more dubious. Plaintiffs further allege that some of the Prospectus's cautionary disclosures were materially misleading, such as the warning that ProNAi's business success depended on PNT2258 and that ProNAi's business would be materially harmed if PNT2258 experienced difficulty in development or in securing regulatory approval. These warnings, plaintiffs allege, were misleading because, by the time they were made, ProNAi knew that the risks warned of had already materialized. *See* AC at 57–58.

In total, plaintiffs claim that the Prospectus contains 17 misstatements about the efficacy of PNT2258, its potential market, and compliance with FDA regulations. *See* Appendix, MS1–17. They fall into two categories: (1) statements about the efficacy of PNT2258—more specifically the results of the Phase I and Pilot Phase II trials, the scientific viability of PNT2258, the applicability of PNT2258 to novel diseases, and the potential market for PNT2258; and (2) statements about the regulatory approval prospects of PNT2258.

#### d. Closing of ProNAi's IPO

On July 21, 2015, six days after the filing of the Prospectus, ProNAi announced that its IPO had closed. *Id.* at 62. ProNAi issued 9.315 million shares of common stock at $17.00 per share. *Id.* That is $158.4 million in gross proceeds. *Id.*

### 2. August 20, 2015—Wolverine Protocol Amendment

On August 20, 2015, ProNAi again adjusted the Wolverine trial protocols. Among other things, it changed the trial's secondary outcome measure to overall response rate only, abandoning as endpoints the disease control rate and duration of overall survival rate. *See id.* at 32; Clinical Trials at 43. ProNAi thus, according to plaintiffs, abandoned "any attempt to show a durational response." AC at 33. These changes, plaintiffs claim, were made because ProNAi possessed trial data which it had not disclosed "showing patients experienced disease progression at a faster rate when being treated with PNT2258 than compared to their prior therapies." *Id.*

On August 20, 2015, ProNAi also "removed as eligible patients those with high-risk aggressive histology such as . . . Burkitt's-like DLBCL." *Id.* at 33; *see also* Clinical Trials at 44. "This [particular] amendment, targeting the most high-risk DLBCL patients," plaintiffs claim, "strongly suggests the sicker patient population initially enrolled in the Wolverine trial to date had not responded to treatment with PNT2258." AC at 33.

Plaintiffs contend that this change in the patent population in the middle of a trial was at odds with FDA regulations, which treat as methodologically unsound the exclusion of data from patients who leave the study before it has finished.

### 3. August 21, 2015—Q2 2015 Report

On August 21, 2015, ProNAi filed its Second Quarter Report with the SEC. AC at 62; Stokes Decl. Ex. 19 ("Q2 2015 Report"). It was signed and certified by Glover. The Q2 2015 Report included substantially the same cautionary statements as the Prospectus.

Plaintiffs allege that the Q2 2015 Report contains seven misstatements, largely similar or identical to the alleged misstatements in the Prospectus. *See* Appendix, MS18–24.

### 4. September 2, 2015–October 14, 2015—Other Wolverine Amendments

Between September 2, 2015 and October 14, 2015, ProNAi modified the Wolverine protocol several more times, adjusting the primary and secondary outcomes and adjusting the time frame of several response measures. AC at 30. For example, on September 9, 2015, ProNAI extended the timeframe to evaluate progression-free survival, a secondary measure, from 12 months to 24 months. *Id.* On September 10, 2015, ProNAi shortened the time to response, another secondary measure, from 24 months to 12 months. *Id.*

### 5. Quarterly Meetings in Late 2015 and Early 2016

Quarterly, in September 2015, December 2015, and February 2016, CW-1 participated in a research meeting attended by Glover and other research scientists. AC at 15. According to CW-1, Glover was briefed about study results "showing DNAi and PNT2258 were ineffective." *Id.* According to CW-1, Glover was "visibly upset" by these reports. *Id.*

### 6. October 29, 2015—Brighton Enrollment Begins

On October 29, 2015, ProNAi began enrollment in the Brighton trial, which was designed to study patients with RCLL. AC at 42. Like the studies before it, Brighton was open-label, non-randomized, and lacked placebo controls. *Id.* "During the Class Period, the Defendants repeatedly stated that they expected interim data from the Brighton trial to be disclosed by the end of 2016." *Id.* The initial criteria for the Brighton trial permitted the enrollment of patients with an ECOG score of 0–2 and with "no limit to the number of prior therapies." AC at 42–43.

### 7. November 5, 2015—Q3 2015 Report

On November 5, 2015, ProNAi filed its Third Quarter Report with the SEC. AC at 67; Stokes Decl. Ex 21 ("Q3 2015 Report"). The Q3 2015 Report indicated that the risk factors had not changed since the Q2 2015 Report. *See* Q3 2015 Report at 29.

Plaintiffs allege that the Q3 2015 Report contained six misstatements. *See* Appendix, MS25–30. Most are similar or identical to the alleged misstatements in the Q2 2015 report.

The new types of misstatements focused on ProNAi's internal financial control procedures. According to the Q3 2015 Report, ProNAi's independent auditor had identified material weaknesses in ProNAi's internal controls over financial reporting, specifically its lack of sufficiently qualified accountant personnel in 2013 and 2014. *See* AC at 71; Q3 2015 Report at 28. Plaintiffs allege that ProNAi's representations that, by September 30, 2015, the company's internal control procedures were effective and that its weaknesses had been addressed, were materially misleading. *See* AC at 71; Q3 2015 Report at 28. As alleged, these statements "(i) misrepresent[ed] the efficacy of its clinical trials; (ii) violate[d] FDA regulations; and (iii) violate[d] the Company's own internal policies related to its 'code of business conduct and ethics' and 'precautions [] to detect and prevent inappropriate conduct.'" AC at 72.

### 8. November 12, 2015—Wolverine Protocol Amendment

On November 12, 2015, ProNAi adjusted the inclusion criteria for the Wolverine study, excluding from the patient population those with ECOG scores of 2 or more and those with four or more prior lines of therapy. *Id.* at 35. Plaintiffs allege that ProNAi changed these criteria because "efficacy data from the ongoing trial showed subjects with an ECOG Performance Scale of 2 or more and/or greater than or equal to four prior lines of therapy were not responding to treatment with PNT2258." *Id.* at 35.

### 9. November 19, 2015 Glover Presentation

On November 19, 2015, at the Jefferies Autumn 2015 Global Healthcare Conference in London, Glover made a 36-page presentation of ProNAi, with an eye towards attracting further investment in ProNAi. AC at 72; Stokes Decl. Ex. 22 ("Nov. 2015 Presentation"). The presentation discussed, at a high-level, DNAi technology and the mechanism by which it works, as well as the PNT2258 clinical studies. Glover's report about the results of the PNT2258 trials was limited to the Phase I and Pilot Phase II trials. Glover discussed the adverse events reported in the Pilot Phase II trial, for example. Nov. 19, 2015 Presentation at 23, 24. He did not comment on the results of the Wolverine or Brighton trials. He indicated that interim results for these would be publicly released in 2016. *Id.* at 26.

Glover's presentation did explain ProNAi's belief that there was a "strong rationale to combine PNT2258" with other therapies. For example, Glover theorized that the combination of PNT2258 with chemotherapy "could sensitize cells over-expressing BCL2," *i.e.*, depress the harmful over-expression of BCL2. *Id.* at 33. The presentation also noted that targeted therapies such as PTK, CD2O and PI3K, which the presentation did not define, modulate the pathways that signal the apoptotic process to cause cancer cell death. Glover theorized that, because BCL2 sits at a key node in the apoptotic cascade, PNT225 "could further enhance apoptotic signals." *Id.* The presentation referred observers to the cautionary statements in ProNAi's SEC filings.

Plaintiffs allege that this presentation contained five misstatements. *See* Appendix, MS31–35. Theses largely duplicate (albeit in less formal terms) previous public statements of ProNAi that plaintiffs fault. The allegedly misleading statements included, for example, that ProNAi planned additional combination and monotherapy trials for PNT2258 in 2016. *See, e.g.*, MS34.

### 10. December 3, 2015 Press Release

On December 3, 2015, ProNAi announced a new management team, including Dr. Gregg Smith, who was appointed vice president of preclinical. He was brought in to "play a key role in ProNAi's portfolio expansion activities, including by being actively involved in the search, evaluation and development planning of any potentially acquirable oncology assets." AC at 49.

### 11. December 9, 2015—Thompson Resignation

On December 9, 2015, Peter Thompson notified ProNAi of his intent to resign from ProNAi's Board and Audit Committee approximately one and a half years after his initial appointment. AC at 45–46.

### 12. December 2015

CW-1 stated that, at this time, "the data coming out of mouse studies in December 2015 showed no effects from PNT2258." *Id.* at 14.

### 13. January 14, 2016 Glover Presentation

On January 14, 2016, Glover made another investor presentation, this time at the JP Morgan 2016 Healthcare conference. *Id.* at 74; Stokes Decl. Ex. 24 ("Jan. 2016 Presentation"). This conference was allegedly designed to target institutional, private equity, and venture capital investment, both short and long term. Glover gave a 27-page presentation that had substantial overlap with his presentation on November 19, 2015. AC at 74–75; *see* Jan 2016 Presentation. The presentation included updated safety and efficacy data for the Pilot Phase II trial. *See* Jan. 2016 Presentation at 14, 17. The presentation again referred readers to ProNAi's earlier cautionary statements in its SEC filings.

Plaintiffs allege that this presentation contained five misstatements. *See* Appendix, MS36–40; AC at 74–75. As before, these statements are largely duplicative of ProNAi's

previous public statements. ProNAi also indicated that it intended to initiate four additional clinical trials to study PNT2258 in 2016. AC at 75; MS40.

### 14. January 25, 2016—Rodrigueza Resignation

On January 25, 2016, ProNAi's announced Wendi Rodrigueza's intent to resign, effective February 25, 2016. AC at 46. She was ProNAi's Chief Science Officer and had previously been vice president of product development. *Id.* Plaintiffs allege that this resignation came while ProNAi "was in the middle of its most important clinical trial to date." *Id.*

### 15. March 3, 2016—2015 Annual Report and Press Release

On March 3, 2016, ProNAi filed its 10K 2015 Annual Report. Stokes Decl. Ex 27 ("2015 Annual Report"). It was signed by Glover and Defendant Japal. AC at 75. In the 2015 Annual Report, ProNAi reiterated its prior cautionary statements.

Plaintiffs allege that the 2015 Annual Report contains 20 misstatements. *See* Appendix, MS41–60. Most were duplicative of previous alleged misstatements. They included claims that the Pilot Phase II trial had demonstrated safety and efficacy, that ProNAi planned to develop PNT2258 for a wide range of indicators, and that ProNAi was pursuing a registration-oriented strategy. As in Q3 2015, ProNAi also indicated that while it had had internal control problems that might have hindered its compliance with securities requirements, these had been fixed.

The same day, ProNAi released a press release to accompany its 10K statement. AC at 86. The Press Release stated that, in 2015, the corporate team continued to transform ProNAi into a "world-class oncology development company." AC at 87. It also stated that it was operationalizing Wolverine and Brighton, studies whose interim results ProNAi would release later that year. *Id.* ProNAi indicated that it was planning further PNT2258 trials. *Id.* ProNAi also indicated that it was intending to purchase other drugs. *Id.* Plaintiffs argue that these

representations, contained in two paragraphs of the press release, *see* Appendix, Statements 61–62, were actionable misstatements.  AC at 87–88.

### 16. March 4, 2016—Vitangcol Resignation and Cha Decision Not to Run for Reelection

On March 4, 2016, ProNAi announced Alvin Vitangcol's intent to resign, effective March 18, 2016, from ProNAi's Board and Audit Committee.  *Id.* at 46.  Vitangcol and Thompson, before they resigned, formed a majority of the Audit Committee.  *Id.*

That same day, ProNAi announced that Albert Cha had decided not to run for reelection to the company's board.  *Id.*  He had been appointed in 2014.  *Id.*

### 17. March 10, 2016—Brighton Trial Amendment

On March 10, 2016, ProNAi modified the inclusion criteria in the Brighton trial to exclude those with ECOG scores of 2 or higher and to exclude those with three or more prior treatment regimes.  AC at 44.  Plaintiffs allege that this modification was designed to "skew the patient population towards more treatable patients."  *Id.*

### 18. April 2016—Messmann Resignation

In April 2016, Richard Messmann, Pronai's former Chief Medical Officer, resigned his post.  AC at 16.  According to CW-1, Messmann had told Glover and others at an executive meeting in late 2015 or early 2016 that DNAi was ineffective and, as synopsized by plaintiffs, that "ProNAi needed to stop telling the public that ProNAi was a DNAi company because DNAi [i]s not real."  *Id.*

### 19. May 10, 2016—Q1 Report

On May 10, 2016, ProNAi filed its quarterly 10-Q Report.  AC at 88.  It was signed by both individual defendants and contained numerous cautionary statements.  *Id.* at 2.

Plaintiffs allege that it contains eight misstatements, which again address the efficacy of PNT2258, its prospects for regulatory approval, and ProNAi's internal controls. *See* Appendix, MS63–70. ProNAi also told investors, in an accompanying press release, that it was on track to release the Wolverine results in June 2016. Stokes Decl. Ex 33 ("Q1 2016 Press Release") at 1.

### 20. May 26, 2016—ProNAi acquires AS-141.

On May 26, 2016, ProNAi acquired the exclusive license to develop and commercialize AS-141, "a small molecule kinase inhibitor targeting CDC7." *Id.* at 53. The purchase involved $900,000 upfront and $270 million if AS-141 was able to achieve regulatory and commercial milestones. *Id.* This acquisition was funded by the IPO. *Id.* at 54.

### D. The Class Period Ends

"On June 6, 2016, the last day of the Class Period, ProNAi announced interim data from the Wolverine Phase 2 trial." AC at 94. ProNAi claimed that it had observed modest efficacy from PNT2258 in the Wolverine trial, but not enough to justify continuing clinical development of the drug. AC at 94. ProNAi further indicated that it had amended the Wolverine trial protocol and excluded the sickest patients from the efficacy results. AC at 95; *see also* Stokes Decl. Ex 35 ("June 2016 Presentation") at 18.

ProNAi also released the results of its Brighton trial, which had only enrolled five patients. AC at 95. Of those five patients, four discontinued treatment and no patient experienced a response. *Id.* ProNAi announced it would be terminating Brighton. *Id.*

ProNAi also disclosed that, in the Pilot Phase II study, patients did have positive responses to the treatment. *See* June 2016 Presentation at 15. However, the disease progressed at a faster rate during the treatment than it had during their prior therapies. AC at 95. Of the 13 patients in the Pilot Phase 2 study, 12 discontinued treatment. *Id.* 85 percent of, or 11 of 13, patients experienced one or more grade three or four adverse events. *Id.*

The results of the trials were further disclosed in a press release.  *See* AC at 96.

On June 6, 2016, following the news of the discontinuation of work on PNT2258, ProNAi's share price dropped to $2.07 on heavy trading volume.  *Id.*  The previous Friday, June 3, 2016, ProNAi's share price had closed at $6.38.  *Id.*

### E.      Procedural History

On November 19, 2016, plaintiffs filed their initial Complaint, alleging that ProNAi, Glover, and Jagpal had violated §§ 10(b) and 20(a) of the Exchange Act and Rule 10b-5.  Dkt. 1.

On February 1, 2017, this Court granted plaintiffs' motion for appointment as co-lead counsel and approved their proposed lead counsel.  Dkt. 18.

On March 17, 2017, plaintiffs filed an Amended Complaint.  It brought substantially the same claims as before but identified more alleged misstatements and made expanded factual allegations.  Dkt. 21.  On May 1, 2017, defendants filed a motion to dismiss and a memorandum of law and declaration in support. Dkts. 22–24.

On June 15, 2017, plaintiffs filed a memorandum in opposition to the motion to dismiss.  Dkt. 25 ("Pl. Br.").  On June 29, 2017, defendants filed a reply and supporting declaration.  Dkt. 27–29.

## II.     Applicable Legal Standards

### A.      Standards for Resolving a Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim will only have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not

raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. Although the court must accept as true all well-pled factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor, *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014), that tenet "is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678.

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321–23 (2007).

First, a complaint alleging securities fraud must meet the requirements of Federal Rule of Civil Procedure 9(b). *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI*, 493 F.3d at 99.

Second, such a complaint must comply with the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u–4(b). *See ECA*, 553 F.3d at 196. In particular, where a plaintiff's claims depend upon allegations that the defendant has made an untrue statement of material fact or that the defendant omitted a material fact necessary to make a statement not misleading, the plaintiff "shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). Thus, in order to plead a claim of securities fraud, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). In addition, the plaintiff

"shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

### B. Elements of Plaintiffs' Claims

Plaintiffs assert claims under §§ 10(b) and 20(a) of the Exchange Act, and Rule 10b-5. Amend. Compl. at 117–20.

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). The SEC's implementing rule, Rule 10b-5, provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R, § 240.10b-5.

To state a claim under § 10(b) of the Exchange Act, a plaintiff must adequately plead "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (internal quotation marks and citation omitted).

To state a claim under § 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quoting *ATSI*, 493 F.3d at 108) (internal quotation marks omitted). If a plaintiff

has not adequately alleged a primary violation, *i.e.*, a viable claim under another provision of the Exchange Act, then the § 20(a) claims must be dismissed. *See id.*

## C. Scienter

As noted, Rule 9(b) and the PSLRA require plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference one could draw from the facts alleged,'" and "the court must take into account plausible opposing inferences." *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (alteration and emphasis in original). The requisite mental state is one "embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (internal quotation marks and citation omitted).

Plaintiffs "may satisfy this requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. And where plaintiffs do not sufficiently allege that defendants had a motive to defraud the public, they "must produce a stronger inference of recklessness." *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001).

Recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citation and emphasis omitted). To qualify as reckless, defendants' conduct must have been "highly unreasonable" and "an extreme departure from the standards of ordinary care." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)) (internal quotation marks omitted). An alleged "refusal to see the obvious, or to investigate the doubtful," must be "egregious" to be actionable. *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (citation omitted).

Plaintiffs can establish recklessness by adequately alleging that "defendants knew facts or had access to non-public information contradicting their public statements" and therefore "knew or should have known they were misrepresenting material facts." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (citing *Novak*, 216 F.3d at 308). However, an inference of scienter does not follow from the mere fact of non-disclosure of relevant information. *In re Sanofi Sec. Litig. ("Sanofi I")*, 87 F. Supp. 3d 510, 534 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi ("Sanofi II")*, 816 F.3d 199. "Instead, to adequately plead scienter, plaintiffs must also provide sufficient factual allegations to indicate that defendants understood that their public statements were inaccurate, or were 'highly unreasonable' in failing to appreciate that possibility." *Id.* (quoting *Novak*, 216 F.3d at 308). "The key, of course, is the honest belief of the management in the truth of information issued to the public." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470 (S.D.N.Y. 2008), *aff'd sub nom. State Univ. Ret. Sys. of Ill. v. Astrazeneca PLC*, 334 Fed. App'x 404 (2d Cir. 2009) (summary order).

In the context of the development of a new drug, "[i]f the management knows that certain facts will necessarily prevent the regulatory approval . . . and conceals these facts from the investing public, then there is scienter." *Id.* Similarly, there is scienter "if the management is reckless in dealing with such adverse facts." *Id.* If, on the other hand, "the management of the company releases positive reports about the drug to the public along the way which the management honestly believes to be true, and where there is no reckless disregard for truth, then that is not securities fraud." *Id.* (collecting cases).

### D.    False or Misleading Statements or Omissions

Section 10(b) and Rule 10b-5 "do not create an affirmative duty to disclose any and all material information." *Id.* at 44; *see also Basic*, 485 U.S. at 239 n.17. "Disclosure of . . . information is not required . . . simply because it may be relevant or of interest to a reasonable

investor." *Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002). An omission of information not affirmatively required to be disclosed is, instead, actionable only when disclosure of such information is "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives*, 563 U.S. at 44 (quoting 17 C.F.R. § 240.10b-5(b)) (ellipses in original); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016) ("'Pure omissions' of information, absent a duty to disclose, are not actionable. Half-truths, however, 'statements that are misleading . . . by virtue of what they omit to disclose,'" are.)

As for the materiality requirement, it "is satisfied when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'" *Id.* at 38 (quoting *Basic*, 485 U.S. at 231–32). As the Supreme Court has explained, a lower standard—such as defining a "material fact" as any "fact which a reasonable shareholder might consider important"—would lead corporations to "bury the shareholders in an avalanche of trivial information[,] a result that is hardly conducive to informed decisionmaking." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976). The "materiality hurdle" is, therefore, "a meaningful pleading obstacle." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013). However, because of the fact-intensive nature of the materiality inquiry, the Court may not dismiss a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197 (internal quotation marks and citation omitted).

### E.     Statements of Opinion

Like objective statements of material fact, subjective statements of opinion can be actionable as fraud.  As the Supreme Court and the Second Circuit have recently clarified, such statements of opinion can give rise to liability in two distinct ways.

First, "liability for making a false statement of opinion may lie if either 'the speaker did not hold the belief she professed' or 'the supporting fact she supplied were untrue.'"  *See Sanofi II*, 816 F.3d at (2d Cir. 2016) (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015)).  "It is not sufficient for these purposes to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events."  *In re Salomon Analyst Level 3 Litig.*, 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004).  "The Second Circuit has firmly rejected this 'fraud by hindsight' approach."  *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (citing *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 85 (2d Cir. 1999)).

Second, "opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor."  *Sanofi II*, 816 F.3d at 210 (citing *Omnicare*, 135 S. Ct. at 1332).  To adequately allege that a statement of opinion was misleading through the omission of material information, "[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Id.* at 209 (quoting *Omnicare*, 135 S. Ct. at 1332).  As the Supreme Court has explained, "a reasonable investor, upon hearing a statement of opinion from an issuer, 'expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the

issuer's possession at a time.'" *Id.* at 210 (quoting *Omnicare*, 135 S. Ct. at 1329). "The core inquiry," then, "is whether the omitted facts would 'conflict with what a reasonable investor would take from the statement itself.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329).

The Supreme Court has instructed that this second theory of liability for opinions, based on omissions of material facts that may render a statement of opinion actionable, should not be given "an overly expansive reading"; rather, establishing liability on such a theory "is no small task for an investor" to meet. *Id.* (quoting *Omnicare*, 135 S. Ct. at 1332) (internal quotation marks omitted). "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts, . . .[and do] not expect that every fact known to an issuer supports its opinion statement." *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329) (alterations and internal quotation marks omitted). "[A] statement of opinion 'is not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the other way.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1329).

Further, the Supreme Court has emphasized, statements of opinion must be considered in the context in which they arise. "'[T]he investor takes into account the customs and practices of the relevant industry,' and . . . 'an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame.'" *Id.* (quoting *Omnicare*, 135 S. Ct. at 1330).

### F.  The PSLRA Safe Harbor for Forward-Looking Statements and the Bespeaks Caution Doctrine

The PSLRA amended the Exchange Act to provide a safe harbor for forward-looking statements. *See* 15 U.S.C. § 78u–5(c). Forward-looking statements are defined as those that contain, among other things, "a projection of revenues, income, [or] earnings," "plans and objectives of management for future operations," or "a statement of future economic performance." *Id.* § 78u–5(i)(1). A forward-looking statement is not actionable if it "is

29

identified and accompanied by meaningful cautionary language or is immaterial or the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010). Because the statute is written in the disjunctive, statements are protected by the safe harbor if they satisfy any one of these three categories. *Id.* Materiality is defined above; the other two categories are defined as follows:

*Meaningful cautionary language*: To qualify as "meaningful," cautionary language "must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements." *Id.* at 771 (quoting H.R. Conf. Rep. 104-369, at 43 (1995)). Language that is "vague" or "mere boilerplate" does not suffice. *Id.* at 772. "To determine whether cautionary language is meaningful, courts must first 'identify the allegedly undisclosed risk' and then 'read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist.'" *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 333 (S.D.N.Y. 2014) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). Plaintiffs may establish that cautionary language is not meaningful "by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." *Halperin*, 295 F.3d at 359.

*Actual knowledge*: The scienter requirement for forward-looking statements—actual knowledge—is "stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity," *Slayton*, 604 F.3d at 773 (quoting *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009)), pled with the required particularity, 15 U.S.C. § 78u–4(b)(2).

This doctrine does not apply to statements made in connection with an initial public offering, such as an IPO prospectus. *See* 15 U.S.C. § 77z–2(b)(2)(D), 78u–5(b)(2)(D); *Johnson v. Sequans Commc'ns S.A.*, No. 11 CIV. 6341 (PAC), 2013 WL 214297, at *10 (S.D.N.Y. Jan. 17, 2013).

However, the bespeaks-caution doctrine, a "corollary of the well-established principle that a statement or omission must be considered in context," does. *Sequans Commc'ns S.A.*, 2013 WL 214297, at *9 (quoting *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010)). Under this doctrine, "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *MF Glob., Ltd.*, 620 F.3d at 141.[7] To apply, however, the cautionary language must pertain to the specific risk that was realized. "[C]autionary language [that] did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss" is insufficient. *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002).

## III.    Discussion

As noted, the AC alleges 70 instances of actionable material misstatements or omissions of material facts that ProNAi had been required to disclose. (For brevity, the Court refers to these collectively as "misstatements.") A large number of these are mere puffery or are ignored or mostly undiscussed in plaintiffs' brief, and—for the reasons below—can be put to one side with limited discussion.

The misstatements on which plaintiffs focus can be broadly grouped into four categories: (1) ProNAi's statements regarding the efficacy of PNT2258; (2) ProNAi's failure to more timely disclose protocol amendments; (3) ProNAi's statements to the effect that it had designed clinical

---

[7] The cautionary-language prong of the PSLRA is based, in part, on the bespeaks-caution doctrine. *Slayton*, 604 F.3d at 770 n.5.

trials with an eye toward FDA approval; and (4) ProNAi's failure to reveal that it lacked

appropriate internal disclosure mechanisms. The Court, after first identifying those statements

that it finds mere puffery, addresses these four categories in turn. The Court then addresses

scienter.

### A. Mere Puffery

Statements are mere puffery, and hence non-actionable, when they are "too general to

cause a reasonable investor to rely upon them." *ECA*, 553 F.3d at 206; *accord Boca Raton*

*Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 37 (2d Cir. 2012).

Various broad assertions by ProNAi fall under this doctrine and are not actionable.

These include that ProNAi's "technology, knowledge, experience, and scientific resources

provide [ProNAi] with competitive advantages," MS13, that ProNAi has a "competitive

advantage," MS11, and that ProNAi was "a leader in developing and commercializing a broad

and diverse portfolio of cancer therapies and deliver therapeutic outcomes that dramatically

changed patients' lives," MS6, MS21, MS45. *See, e.g.*, *Boca Raton Firefighters*, 506 F. App'x

at 37 (statements regarding integrity, credibility, and objectivity held puffery); *SE Pennsylvania*

*Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 1:12-CV-00993, 2015 WL 3833849, at *30

(M.D. Pa. June 22, 2015) (claim of experience expertise held puffery); *Norfolk Cty. Ret. Sys. v.*

*Tempur-Pedic Int'l, Inc.*, 22 F. Supp. 3d 669, 684 (E.D. Ky. 2014) (claim of "strengthened

competitiveness" held puffery), *aff'd sub nom. Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*,

614 F. App'x 237 (6th Cir. 2015); *Sequans Commc'ns*, 2013 WL 214297, at *14 (statement that

company was "early leader" held puffery); *Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d

1052, 1071 (C.D. Cal. 2012) (claim of a deep executive bench held puffery); *In re Xinhua Fin.*

*Media, Ltd. Sec. Litig.*, No. 07 CIV. 3994 LTS/AJP, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25,

2009) (claim that management team was "strong," "experienced" and "capable" held puffery); *In*

*re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 768 (E.D. Va. 2004) (claim of competitive

advantage held puffery).

**B.     Statements Regarding the Efficacy and Safety of PNT2258**

ProNAi made numerous statements about the efficacy of PNT2258 which plaintiffs

challenge.  These fall into three broad categories (with some falling into multiple categories): (1)

statements about the results of the Phase I and Pilot Phase II trials,[8] (2) statements about the

scientific mechanism behind PNT2258,[9] and (3) statements of general belief as to PNT2258's

potential application to novel settings and markets.[10]  The Court addresses each in turn.

**1.     The Results of the Phase I and Pilot Phase II Trials**

Plaintiffs allege that ProNAi's statements about the efficacy and safety of PNT2258 were

materially misleading because ProNAi did not disclose: (1) pharmacokinetics (efficacy) results

from the Phase I study, (2) interim results of the Wolverine and Brighton trials, and (3) certain

data points regarding interim and final results of the Pilot Phase II study.

The following are representative examples of the statements ProNAi made about its

clinical trials that plaintiffs fault:

- "In a recent single agent Phase 2 trial of 13 patients with relapsed or refractory non-Hodgkin's lymphoma (NHL), PNT2258 demonstrated evidence of efficacy and tolerability [and] the potential to change treatment paradigms across a wide range of oncology indications."  MS1.[11]

---

[8] Statements that fall into this category include:  MS1, MS2, MS18, MS22, MS25, MS31, MS36, MS41, MS50, and MS63.

[9] Statements that fall into this category include:  MS4, MS12, MS14, MS31, MS33, MS34, MS35, MS38, MS52, and MS53.

[10] Statements that fall into this category include:  MS9, MS10, MS12, MS14, MS15, MS31, MS33, MS38, MS39, MS46, MS48, MS51, and MS53.

[11] The Court is constrained to note that, in the chart plaintiffs attach to their opposition brief, summarizing the alleged misstatements, plaintiffs themselves misleadingly present various challenged statements.  For example, as to MS1, plaintiffs omit that the phrase "demonstrated

- "Although not statistically powered for formal efficacy analysis, we believe the preliminary evidence of efficacy observed in [the Pilot Phase II] trial, coupled with safety and tolerability data collected to date, suggest that PNT2258 has the potential to change treatment paradigms across a wide range of oncology indications."  MS2.

- "In a recent single-agent Phase 2 trial of 13 patients with relapsed or refractory non-Hodgkin's lymphoma (NHL), PNT2258 demonstrated evidence of anti-tumor activity . . . we believe the preliminary evidence of efficacy observed in this trial, coupled with safety and tolerability data collected to date, suggest that PNT2258 has the potential to change treatment paradigms across a wide range of oncology indications.  Accordingly, we plan to pursue a broad registration oriented clinical development program, initially in hematologic malignancies, that we anticipate will provide the foundation of a global registration strategy for PNT2258."  MS18, MS41.

- "We have conducted two clinical trials with PNT2258 to date:  a Phase 1 safety trial in patients with relapsed or refractory solid tumors and a Phase 2 trial in patients with relapsed or refractory non-Hodgkin's lymphoma (NHL).  Having observed preliminary evidence of efficacy and tolerability, we plan to pursue a broad registration-oriented clinical development program, initially in hematologic malignancies, that we anticipate will provide the foundation of a global registration strategy for PNT2258."  MS25.

As the examples above reflect, ProNAi commented on the clinical trial results from only the Phase I and Pilot Phase II trials.[12]  In discussing the Phase I trial, ProNAi emphasized that it

---

efficacy" in the statement referred not to PNT2258, as the language as excerpted implies, but to the Pilot Phase I trial itself.  Similarly, as to MS2, plaintiffs omitted the following qualifying language at the start of the alleged misstatement: "Although not statistically powered for formal efficacy analysis, we believe . . ."  In the chart at the end of this decision, the Court has endeavored to include the challenged statements in full relevant context.

[12] Among the alleged misstatements, the only even conceivable exception is Glover's single-sentence claim, in his November 19, 2015 slide presentation, that "clinical data to date for lead product candidate, PNT2258, demonstrates single agent efficacy and durability with a well-tolerated safety profile."  MS31.  But read in context, it is clear that this locution was not meant to cover, and did not cover, the then-nascent Wolverine or Brighton studies, which had begun enrollment only the month before.  On the same slide, Glover refers to the planned initiation of additional Phase II trials starting with third line relapsed or refractory DLBCL (a clear reference to Wolverine) and Richter's transformed CLL (a clear reference to Brighton).  Those trials anticipated that clinical readouts would be received over the upcoming 12–24 months—*i.e.*, there were as-yet no clinical readouts.  Nov. 2015 Presentation at 3.  Notably, too, in a part of the same

was a safety trial.  It did not claim that that trial demonstrated the drug's efficacy.  *See, e.g.*, Prospectus at 86; Q2 2015 Report at 22.  It did discuss how the Pilot Phase II study exhibited preliminary evidence of efficacy.

Turning to the alleged omissions, the Court addresses them in the order described above:

*Phase I*:  ProNAi's choice not to release the pharmacokinetics results of the Phase I study did not make its statements about PNT2258's efficacy materially misleading.  As ProNAi discussed in the Prospectus (and later) and as plaintiffs admit, Phase I studies, including that of PNT2258, are designed to address safety, not efficacy.  Typically the dosage administered in a Phase 1 trial is insufficient to demonstrate efficacy.  And ProNAi never claimed that the Phase 1 study demonstrated the drug's efficacy.  ProNAi was thus under no obligation to disclose data from the study arguably reflecting on the efficacy of PNT2258, as such data was not "necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'"  *Matrixx Initiatives*, 563 U.S. at 44.  On the contrary, had ProNAi disclosed the pharmacokinetics results of a study undertaken for a different purpose (assessment of safety), this might have confused investors unaware that the Phase I pharmacokinetics study was not aimed at testing efficacy.

*Wolverine and Brighton*:  ProNAi's choice not to disclose the interim results of the Wolverine and Brighton trials did not make the statements it made on other subjects materially misleading.  "Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Basic*, 485

---

presentation titled "clinical results," Glover discussed only the results of the Phase I and Pilot Phase II trials, *id.* at 6, 18–24, not Wolverine or Brighton.  Where Glover discussed Wolverine and Brighton was in a separate section titled "clinical and commercial development," and there, he covered only the design and theoretical justification of these studies, not their results.  *See id.* at 25–31.  A reader viewing the sentence above in context would understand the reference to "clinical data to date" not to refer to Wolverine or Brighton.

U.S. at 239 n.17. Under ordinary circumstances, only once a disclosure has been made is there "a duty to be both accurate and complete." *Caiola v. Citibank*, 295 F.3d 312, 331 (2d Cir. 2002). And where a prior statement has been made, a duty may also arise to update it where it has become misleading due to intervening developments. *See In re Time Warner, Inc. Secs. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).

Here, there was no such duty to update the public about the results of the Wolverine and Brighton trials because ProNAi never publicly commented on their results or promised that these results would be reported during the Class Period. On the contrary, ProNAi repeatedly stated that it would wait until mid-2016 to release the interim results for the Wolverine trial and until late 2016 to release the interim results of the Brighton trial. *See, e.g.*, Prospectus at 91; March 2016 Press Release. It was not until June 6, 2016 that ProNAi—in line with its promised timing as to Wolverine and ahead of its promised schedule as to Brighton—disclosed results from both trials. It did so in the course of announcing its decision to discontinue development of PNT2258. This announcement post-dated the Class Period. *See* June 2016 Presentation. No reasonable investor would interpret ProNAi's statements during the Class Period about the Phase I and Pilot Phase II trials as addressing, let alone making representations about, the outcomes of the Wolverine or Brighton trials. Notably, too, ProNAi had cautioned, including at the start of the Class Period, that "[t]he outcome of . . . early clinical trials may not be predictive of the success of later clinical trials." *See* Prospectus at 15; Q2 2015 Report at 33; 2015 Annual Report at 28.

Plaintiffs cite one case, *In re Regeneron Pharm. Sec. Litig.*, No. 94 CIV. 1785 (CLB), 1995 WL 228336 (S.D.N.Y. Mar. 10, 1995), for the proposition that ProNAi had a duty to disclose earlier the Wolverine and/or Brighton interim trial results. But it is inapposite. In *In re Regeneron*, the issuer disclosed that the Phase III trial had demonstrated that the drug that was

the subject of the study was "well tolerated" and "produced few side effects." *Id*. at *3. In light of this affirmative disclosure about the same trial, the court there held on the facts at hand that the issuer had had a duty to disclose the omitted facts at issue, and could not treat the omitted information regarding dose holds and reductions during the Phase III trial as "so obviously unimportant to reasonable shareholders . . . that reasonable minds cannot differ on the question." *Id*. at *5. Here, in contrast, plaintiffs never made representations about the results of either trial. No duty to correct, update, or contextualize those results thus arose.[13]

*Pilot Phase II*: Plaintiffs allege that ProNai's failure to disclose the following about the Pilot Phase II trial made its statements about that trial materially misleading: that (i) 11 of the 13 patients in the trial experienced one or more grade three or four adverse events, (ii) 12 of the 13 patients discontinued treatment due to disease progression, and (iii) the results of the Pilot Phase 2 study showed that patients experienced disease progression at a faster rate with PNT2258 than with their previous therapy.[14] The Court addresses these in turn.

First, as to adverse events, ProNAi's Prospectus disclosed that, cumulatively, the 13 patients had experienced 14 Grade 3 adverse events, while representing that no patient had experienced a Grade 4 adverse event. Prospectus at 90. Later, in the January 14, 2016 investor

---

[13] Even if it ProNAi had a duty to disclose such interim results earlier than it did—and it did not—its failure to do so could not be described as reckless, *i.e.*, "highly unreasonable" or "an extreme departure from the standards of ordinary care." *In re Centerline Holdings Co. Sec. Litig.*, 613 F. Supp. 2d 394, 404 (S.D.N.Y. 2009), *aff'd*, 380 F. App'x 91 (2d Cir. 2010). This theory of liability would thus independently fail for lack of adequately pled scienter.

[14] In their brief, plaintiffs claim that 50% of patients with an ECOG score of two or more and/or four or more prior therapies experienced a Grade 5 adverse event. The Court cannot find that factual allegation in the AC. And the June 6, 2016 presentation, upon which plaintiffs base their allegations about the outcome of the Pilot Phase II trial, makes a contrary factual assertion: "No Grade 5 AEs were observed." June 6, 2016 Presentation at 14. Plaintiffs may not amend their pleadings by adding new factual allegations in a brief. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998).

presentation, Glover disclosed updated data (as of November 2015) regarding Pilot Phase II adverse events. The bottom line remained the same: All patients had experienced adverse events at least plausibly related to PNT2258, and, of these, 14 were Grade 3. January 2016 Presentation at 16. The January 2016 presentation did not address the occurrence of Grade 4 adverse events. Finally, on June 6, 2016, ProNAi disclosed that 11 of the 13 patients in the trial (or 85%) experienced one or more grade three or four adverse events. AC at 31–32.

Plaintiffs argue that the failure earlier to disclose the statistical data disclosed on June 6, 2016 was a material omission. However, the disclosure on June 6, 2016 was not materially different from the prior disclosures. In particular, the June 6, 2016 disclosure did not, as plaintiffs imply, report that PNT2258 had caused these adverse events, only that 11 patients on PNT2258 experienced Grade 3 or 4 adverse events. That disclosure was in line with ProNAi's earlier disclosures. The limited incremental statistical specificity of the June 6, 2016 disclosure, which allowed for the possibility—although without explicitly stating—that some adverse events reached the grade 4 level, was not evidently material, absent an allegation that PNT2258 had *caused* those events. The "mere existence of reports of adverse events," without some indication that the drug at issue caused those events, does not satisfy *Basic*'s "total mix" materiality standard. *Matrixx Initiatives*, 131 S. Ct. at 1321.

Second, as to the discontinuance of treatment, ProNAi's Prospectus disclosed, at the start of the Class Period, that 10 of the 13 patients had discontinued PNT2258. Plaintiffs do not dispute the accuracy of that statement. In his January 14, 2016 investor presentation Glover disclosed that two more patients had stopped treatment. *See* January 2016 Presentation at 14.

Plaintiffs appear to claim that ProNAi's disclosure of the termination of treatment by these two additional plaintiffs was unduly delayed, but they do not allege how long this delay

was.  Comparing the durability charts in the Prospectus and the January 2016 presentation, it is clear that the two patients had not discontinued their treatment right away; on the contrary, one appears to have remained in the treatment group for more than 200 days.  Plaintiffs do not make allegations as to the date of discontinuance of treatment and hence the duration of any delay by ProNAi in updating the numbers of patients who had discontinued treatment.  On the pleadings, it appears that for most of the gap between the Prospectus date and January 2016 presentation, there had been at least two patients, not one, still on PNT2258 as part of the Pilot Phase II study.

Particularly given the hazy timeline as pled in the AC, ProNAi's alleged failure earlier to disclose the one (or two) terminations at issue is plainly not material.  That is especially so because patients in Phase II trials regularly discontinue treatment, and because ProNAi had timely admitted the earlier termination of the vast majority of participating patients.  In any event, for the reasons covered below, as pled, no inference of scienter attaches to any lapse as to the timing of disclosure of the termination of the one (or two) patients that plaintiffs put at issue.

Third, as to the disclosure of disease progression data, ProNAi did not disclose that patients with multiple lines of prior therapy performed worse on PNT2258 than on previous therapies.  Plaintiffs do not allege that ProNAi had a freestanding duty to disclose such information.  Instead, they argue that the lack of such a disclosure made ProNAi's statements about the drug's efficacy as demonstrated in the Pilot Phase II trial materially misleading.

That argument is unconvincing.  As context, plaintiffs admit that "patients with multiple prior lines of failed therapies are less likely to respond favorably to subsequent therapy lines." AC at 18.  And ProNAi did not make any representations about PNT2258's success relative to any prior therapies.  Thus, when ProNAi became aware of this adverse data, it did not have a duty to correct or update its public statements.  *Cf. In re Int'l Bus. Machines Corp. Sec. Litig.*,

163 F.3d 102, 109–110 (2d Cir. 1998) (duty to correct arises when company, which has made an historical statement it believed correct, later learns it was not; and duty to update arises when statement that was reasonable at the time becomes misleading because of a subsequent event). In any event, for the reasons covered below, even if this omission were otherwise actionable, plaintiffs have failed to adequately plead that the omission was with scienter.

## 2.    Claims about PNT2258's Scientific Viability

The following is a representative sample of the statements by ProNAi about the scientific viability of PNT2258 and its novel applications that plaintiffs claim are actionable:

- "[DNAi's] unique mechanism for impacting downstream BCL2 protein levels . . . *could* also potentially amplify and be complementary to other therapeutic modalities." MS3.

- "We *believe* that DNAi technology may be applicable to additional high value genetic targets beyond BCL2 that are also challenging to drug by conventional means. We *plan* to leverage our DNAi technology platform to generate a pipeline of product candidates that modulate the transcription of oncogenes known to be involved in cancer, and potentially implicated in other diseases." MS4, MS52.

- "Since BCL2 resides at a key node of the apoptotic pathway, there is a scientific rationale to enhance the apoptotic signal with the addition of PNT2258 to these targeted therapies. We *believe* there is a strong scientific rationale to suggest that targeting BCL2 could be clinically beneficial in combination with a targeted therapy and *may initiate* a Phase 2 combination trial of PNT2258 in combination with a targeted therapy." MS51.

At the outset, some challenged statements in this category are clearly protected as forward-looking statements. The PSLRA safe harbor provision, as noted, applies to all of ProNAi's forward-looking statements save those in the Prospectus, and insulates such statements where they were accompanied by meaningful cautionary language, were not material, or were made without actual knowledge that they were false or misleading. *Slayton*, 604 F.3d at 765–

66.[15] And ProNAi's forward-looking statements in the Prospectus are protected by the bespeaks-caution doctrine, under which "[a] forward-looking statement accompanied by sufficient cautionary language is not actionable." *MF Glob., Ltd.*, 620 F.3d at 141.

Here, ProNAi's forward-looking public statements were accompanied by a considerable array of cautionary disclosures. From the start of the Class Period, ProNAi repeatedly cautioned that (1) PNT2258's clinical trials might fail to demonstrate efficacy, (2) the previous clinical trials might not predict future results (either later in those trials or in future ones), (3) the Phase I and Pilot Phase II clinical trial were uncontrolled, involved small sample sizes, and were of a shorter duration than required for regulatory approval, and (4) because of the limited nature of these trials, they might not indicate future results (especially in larger-scale, controlled trials). Prospectus at 15. ProNAi also cautioned that (1) the science underlying its DNAi technology was limited and preliminary, (2) "our DNAi oligonucleotides [might] not possess the ability to hybridize to complementary regions of genomic DNA of an oncogenic target," (3) ProNAi might never be able to refine the DNAi technology sufficiently, and (4) ProNAi may exhibit different characteristics when administered to people than it did in preclinical settings. *Id.* at 27. ProNAi continued to give such fulsome warnings throughout the Class Period. *See* Q2 2015 Report at 32–33, 42; Q3 2015 Report at 29 (incorporating by reference the Q2 2015 Report); Nov. 2015 Presentation at 2; Jan. 2016 Presentation at 2; 2015 Annual Report at 26–28, 31; Q1 2016 Press Release at 2.

---

[15] The statements must also have been identified as forward-looking. *Slayton*, 604 F.3d at 769. That requirement was undisputedly met here.

Together the cautionary statements convey substantive information[16] about the precise risks that the pleaded facts allege eventually materialized: specifically, that PNT2258 might fail because the technology might ultimately prove ineffective, and that the Wolverine and Brighton trials might fail to produce even the results seen in the Pilot Phase II trial. ProNAi's cautionary language was of a piece, in its specificity, with the cautionary language upheld as effective by this Court (and, on appeal, the Second Circuit) in *Sanofi I*.[17]

This case thus is far afield from *Slayton v. American Express Co.*, on which plaintiffs rely, where the issuer warned generally of risks but failed to warn of specific risks to investors on which it was well aware. *Slayton*, 604 F.3d at 772. Here, ProNAi warned that its specific drug, PNT2258, might fail to prove effective. Its cautionary statements were thus not, as plaintiffs claim, mere boilerplate. *Compare Ill. State Bd. of Inv. v. Authentidate Holding Corp.*, 369 Fed App'x 260, 264 n. 3 (2d Cir. 2010) (summary order) (warning that forward-looking statements

---

[16] *See Slayton*, 604 F.3d at 772 ("To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must [have] . . . conveyed substantive information."); *accord In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 247 (2d Cir. 2016).

[17] For example, *compare* Prospectus at 15 ("The outcome of preclinical testing and early clinical trials may not be predictive of the success of later clinical trials, and interim results of a clinical trial do not necessarily predict final results. To date, we have only obtained results from Phase 1 and Phase 2 clinical trials that are uncontrolled, involve small sample sizes and are of shorter duration than would be required for regulatory approval. Data from these clinical trials and our preclinical studies should not be relied upon as evidence that later or larger-scale, controlled clinical trials will succeed."), and *id.* at 27 ("We may discover that our DNAi oligonucleotides do not possess the ability to hybridize to complementary regions of genomic DNA of an oncogenic target or our LNP delivery technology does not possess certain properties required for effective delivery, such as the ability to remain stable in the human body for the period of time required for the drug to reach the cell nucleus. We may spend substantial funds attempting to develop and refine these properties and may never succeed in doing so."), *with Sanofi I*, 87 F. Supp. 3d at 536 ("[A] regulatory authority may deny or delay an approval because it was not satisfied with the structure or conduct of clinical trials or due to its assessment of the data we supply. A regulatory authority, for instance, may not believe that we have adequately addressed negative safety signals.").

were "subject to certain risks and uncertainties" was boilerplate), *with Halperin*, 295 F.3d at 360 (warning that securities were not presently and might not ever be registered for resale was meaningful cautionary language, not boilerplate), *and Sanofi I*, 87 F. Supp. 3d at 536 (warning that FDA might not approve a drug if it was not satisfied with the structure or conduct of clinical trials, or decided to evaluate the trial results differently, not boilerplate).[18]

Tellingly, plaintiffs do not plead facts as to how ProNAi's forward-looking warnings could or should have been more specific. Plaintiffs do not allege, for example, that a particular aspect of PNT2258's biological mechanism or design caused the drug's failure and that ProNAi failed to warn of that risk. Nor do they allege that a clinical trial design deficiency caused the drug's failure. (On the contrary, plaintiffs allege that ProNAi modified its study design to bring about more positive results, but that these efforts failed.) At bottom, plaintiffs argue that the drug, PNT2258, simply did not work. ProNAi emphatically and repeatedly disclosed that risk. Reading the company's disclosures as a whole, a reasonable investor could not possibly have missed the risk that PNT2258 might not prove effective.

Plaintiffs separately claim that the risks warned of in ProNAi's cautionary statements had already materialized, but that the company did not disclose this. Specifically, they argue that that the risk that "PNT2258 will fail to demonstrate efficacy" had already come to pass. But that, too, is wrong. Plaintiffs do not plead that PNT2258 had durably failed during the Class Period. Rather, as plaintiffs admit, ProNAi continued to conduct the Pilot Phase II, Wolverine, and Brighton trials throughout the Class Period, in an ongoing attempt to demonstrate PNT2258's

---

[18] Plaintiffs argue that ProNAi's cautionary language was boilerplate because it did not change over time. But the case they cite for that proposition, *Slayton*, found the cautionary language ineffective because it did not warn of the risk that materialized. It noted the lack of change to the warning over time as bolstering the warning's ineffectiveness. 604 F.3d at 772.

efficacy. And ProNAi invested substantial sums in that pursuit. Plaintiffs do not credibly allege that these efforts were viewed in real time as dead on arrival and certain to prove futile. Not until the end of the Class Period did ProNAi cancel those trials and conclude, and announce, that PNT2258 did not merit further investment. ProNAi's cautionary statements thus did not warn of a risk that had already come to pass. ProNAi may thus rely on them in defending its forward-looking statements.[19]

The remaining statements in this category—regarding the potential for novel applications for PNT2258—are statements of opinion. Such statements "include subjective statements that reflect judgments as to values that [are] not objectively determinable." *In re Gen. Elec. Co. Sec. Litig.*, 856 F. Supp. 2d 645, 653 (S.D.N.Y. 2012). Statements that express "expectations for the future rather than presently existing, objective facts" are also statements of opinion. *Fialkov v. Alcobra Ltd.*, No. 14 CIV. 09906 (GBD), 2016 WL 1276455, at *6 (S.D.N.Y. Mar. 30, 2016).

---

[19] For much the same reason, plaintiffs' attack on ProNAi's cautionary statements themselves as actionable fails. Plaintiffs claim that such statements (including MS5, MS17, MS20, MS24, MS27, MS44, MS54, MS64, MS65, MS68) were actionable because, while warning of a risk, they did not disclose that the risk had already materialized. It is true that cautionary statements can give rise to liability if they warn of a risk that has already occurred. *See, e.g.*, *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 399–400 (S.D.N.Y. 2005) (cautionary statements can constitute misleading statements if warned of risk had already occurred); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 518 (S.D.N.Y. 2013) (same). *But see In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08 CIV. 9203 (RJS), 2010 WL 1372709, at *7 (S.D.N.Y. Mar. 31, 2010) (boilerplate warnings not actionable as misstatements); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (discussing division of authority but suggesting that, in context, the particular boilerplate warnings could not be actionable). But here, for the reasons discussed above, while the risk of failure was present (and disclosed) at all times, the reality of failure of PNT2258 did not durably come to pass during the Class Period.

Plaintiffs relatedly fault ProNAi's cautionary statements to the effect that the company might need to suspend, repeat, or terminate clinical trials if not conducted other than in accord with regulatory requirements. But, as pled, that risk did not materialize. Rather, as the AC pleads, ProNAi eventually cancelled the trials because the results were poor.

So are statements using phrases classically indicative of opinion such as "I believe" and I think."

*See Omnicare,* 135 S. Ct. at 1326 (discussing how use of the phrases "I believe" or "I think" transform statements of fact into ones of opinion).[20]

As noted, such statements of opinion are actionable only if (1) "the supporting fact she supplied were untrue," (2) "the speaker did not hold the belief she professed," or (3) "the speaker omits information whose omission makes the statement misleading to a reasonable investor." *Sanofi II*, 816 F.3d at 210. Here, plaintiffs make no allegation that any of the supporting facts contained in these statements by ProNAi were untrue. For example, as to statement MS51, plaintiffs do not allege that BCL2 does not reside at a key node of the apoptotic pathway. Nor do plaintiffs allege facts supporting the claim that ProNAi and the individual defendants did not believe these statements when made. Plaintiffs concede as much by declining to refute ProNAi's contention that there is no evidence that it and the individual defendants did not sincerely believe its opinion. Rather, plaintiffs limit their claim of opinion liability to the avenue that *Omnicare* left open for situations in which "an opinion is actionable, regardless of subjective belief," based on the omission of contrary material facts possessed by the speaker. Pl. Br. at 25 n.21. Specifically, plaintiffs argue that defendants' stated "belief that PNT2258 was effective or had market potential lacked any reasonable basis as the monitored trial data demonstrating PNT2258 was ineffective in real-time." *Id.*

---

[20] Plaintiffs argue that statements beginning with qualifying words such as "I believe" are statements of fact, not opinion. But that claim is inconsistent not only with *Omnicare*, but also with the pre-*Omnicare* case (from a court in a different circuit) on which plaintiffs rely for this proposition: *Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335 (E.D. Pa. 2014). That case holds merely that "words of futility or belief" do not transform an otherwise non-forward-looking statement into one protected by PSLRA's safe harbor. Whether a statement is protected by the PSLRA safe harbor, however, does not speak to whether a statement qualifies as one of opinion rather than fact.

In support of this theory of liability, plaintiffs argue that ProNAi's non-disclosure of certain Pilot Phase II data, the results from the Wolverine and Brighton trials, and the Wolverine and Brighton protocol amendments made materially misleading defendants' opinion statements to the effect that PNT2258 was believed to have certain potential applications. That is wrong. The opinion statements in question were explicitly qualified and conditional. They state, for example, that the drug "could potentially amplify and be complementary to" other therapies, "may be applicable" to certain "high value genetic targets" that had thus far proven challenging to address, and that the company "may initiate" a trial of PNT2258 on the basis that there was "a strong scientific rationale" that the drug "could be clinically beneficial" in combination with a targeted therapy. Defendants' opinion statements did not quantify the prospects of PNT2258's success other than to leave open that success was possible. And, read with precision, the opinion statements speak to the applicability of PNT2258 in distinct situations—ones that were not studied in the Pilot Phase II, Wolverine, or Brighton trials. In particular, those studies were single-agent studies that did not test the effect of PNT2258 in combination with other therapies. Nor did these studies test the applicability of DNAi technology, more broadly, to other genetic targets. The facts plaintiffs fault ProNAi for omitting—such as (1) that 1–2 additional patients in the Pilot Phase II trial had discontinued use of PNT2258 during the Class Period than the company earlier had disclosed, and (2) Wolverine and Brighton's protocol amendments (which actually were disclosed)—do not conflict with the information a reasonable investor would take from the statements of opinion at issue. *See Sanofi II*, 816 F.3d at 210.

Plaintiffs separately theorize that these opinion statements are actionable because ProNAi omitted information regarding the efficacy of DNAi. Plaintiffs contend that ProNAi had learned in its pre-clinical internal studies that DNAi and the PNT2258 application of it were not proving

effective. This claim rests on factual averments credibly attributed to confidential witnesses CW-1 and CW-2. They are quoted as stating that the experiments they conducted and discussed, attempting to prove the scientific concept underlying DNAi and the mechanism of action for PNT2258, had failed.[21] CW-1 has represented that DNAi proved ineffective even after ProNAi changed the studies' designs, *see* AC at 13–14, and CW-2 has represented that the studies in which CW-2 participated likewise failed to show evidence of a "signal—*e.g.*, down regulation of RNA and protein using PNT2258"—again despite ProNAi's modification of study methodologies to attempt to yield positive results, *id.* at 14.

In the Court's judgment, this theory of Section 10(b) liability—that ProNAi's failure to disclose that its design studies had thus far failed conceptually to validate either DNAi (or its PNT2258 application) made defendants' guardedly hopeful opinion statements about PNT2258's potentially misleading—is plaintiffs' most substantial.

---

[21] To make out a § 10(b) or § 20 claim, a plaintiff may rely on an unnamed confidential witness. In doing so, the plaintiff must identify the roles occupied by the witness with "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314; *accord New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 Fed. App'x 10, 14 (2d Cir. 2011); *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). Here this standard has been met, a fact ProNAi does not dispute. As described in the complaint, CW-1 was a former research scientist who executed experiments on the mechanism of action of new DNAi targets as a proof of concept. It is therefore plausible that CW-1 was in weekly meetings at ProNAi where, as alleged, executives and high-level scientists discussed study results. CW-1 was also in a position to grasp consensus views that emerged from those meetings. (The AC is, however, unacceptably opaque as to how CW-1 purportedly knew that "the data coming out of mouse studies in December 2015 showed no effects from PNT2258." AC at 14. The AC does not allege, for example, that CW-1 participated in conducting those studies or attended meetings where those studies were discussed.) CW-2, as alleged was a former ProNAi research associate responsible for researching the molecular action of PNT2258. CW-2 was likewise plausibly alleged to known the results of such work and to have participated in meetings discussing the results of the preclinical studies that CW-2 helped conduct.

To be sure, the Supreme Court has cautioned that this theory of liability for opinion statements, based on nondisclosure of facts "cutting the other way," is not to be given an overly expansive reading and that establishing liability on such a theory "is no small task for an investor" plaintiff to meet. *Omnicare*, 135 S. Ct. at 1329, 1332; *accord Tongue v. Sanofi*, 816 F.3d at 210. As the Court has emphasized: "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts, . . . [and do] not expect that every fact known to an issuer supports its opinion statement." *Omnicare*, 135 S. Ct. at 1329. And at least as pled, the omitted studies did not specifically test the applicability of DNAi and PNT2258 to the novel settings addressed in the ProNAi statements of opinion at issue. At the same time, if ProNAi's proof-of-concept studies had truly been unremittingly bad, a jury might find unreasonable corporate statements expressing hope that the drug could prove a solution to a range of medical problems when unaccompanied by a disclosure that ProNAi had wholly failed to date to validate the drug's underlying concept. Mindful that a court is not to dismiss a complaint for failure to allege materiality unless the challenged statement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance," *ECA*, 553 F.3d at 197, the Court finds that, were plaintiffs' factual allegations as to this theory well pled, they would suffice to plead a material omission rendering defendants' opinion statements misleading.

Plaintiffs' factual allegations as to this theory are, however, problematic in part, because most of the allegations by the CWs are unmoored in time. The AC does not attempt to pinpoint when it became apparent that those studies as to the efficacy of DNAi and PNT2258 had yielded such dire results as to make the underlying therapeutic concept inescapably dubious. *See NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, No. 3:09-CV-01740 VLB, 2013 WL

1188050, at *28 (D. Conn. Mar. 23, 2013) ("Allegations that are so amorphous as to time periods are not pled with the requisite specificity."); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) ("This omission [of a specific time period] renders the task of matching CW allegations to contrary public statements all but impossible, since allegations about an unspecified time period cannot supply specific contradictory facts available to Defendants at the time of an alleged misstatement."). On the contrary, the AC alleges merely that "[f]rom October 2014 until February 2015, CW1 worked on the mechanism of action of PNT2258." AC at 14. It is silent as to when within that time window ProNai's scientists had concluded that that study had come up empty. The same is true for the allegations relating to CW-2. As to time frame, the AC alleges that CW-2 worked at ProNai from May 2015 to July 2016 but otherwise is imprecise as to dates.

The only factual allegations that concretely pin down in time the communication of negative study findings to defendants are a subset of allegations from CW-1. Specifically, the AC alleges that CW-1 participated in research meetings attended by Glover and top scientists in September 2015, December 2015, and February 2016, that at these meetings participants were briefed about study results "showing DNAi and PNT2258 were ineffective," and that in response, Glover was visibly upset. *See id.* at 15.

On the basis of this factual allegation, the Court finds that the AC adequately alleges that, as of September 2015, the outcomes of the preclinical trials—notably that DNAi and PT2258 were ineffective—had reached Glover and other high-level ProNai executives in the company. It is a close question whether that allegation suffices to make ProNAi's opinion statements regarding PNT2258's scientific potential materially misleading, because CW-1 notably does not state that DNAi and PT2258 were found irremediably ineffective, only that as of those three

49

meetings, they had not been shown effective. Nevertheless, the failure of these technologies to bear even conceptual fruit by then is, the Court holds, sufficiently significant to make material its omission from ProNAi's opinion statements guardedly noting PT2258's potential viability.

The Court therefore holds that the AC has adequately pled that ProNAi's opinion statements as to the scientific viability of PNT2258 were materially misleading from September 2015 forward.[22] The Court discusses below whether the facts pled support that this material omission was made with scienter.

### 3. Claims about the Market for PNT2258

ProNAi also made claims about the potential market for PNT2258. The following are representative:

- "Pursue a Multi-Faceted Development Strategy for PNT2258 Across Many Oncology Indications. In addition to Wolverine and Brighton, we intend to expand the commercial market opportunity for PNT2258 by developing it for the treatment of a wide variety of BCL2-driven tumors, including other hematologic malignancies, such as leukemias and myelomas, as monotherapy and in combination with other therapeutic agents or treatment regimens." MS9, MS49.

- "As we further develop PNT2258, we plan to build a commercial infrastructure to directly market in North America and possibly other major geographies that are core to our commercial strategy. We plan to enter into collaborations for the development, marketing and commercialization of PNT2258 in additional geographies at an appropriate time. We also plan to invest in scaling our manufacturing capacity to support our global commercial strategy." MS10.

Although plaintiffs' theory of liability as to these statements is not fully clear, plaintiffs appear to fault these statements on the ground that ProNAi allegedly knew—from internal studies and

---

[22] Where a plaintiff has alleged with sufficient specificity activity in one period, that activity "can support an inference of similar circumstances in a subsequent period." *Blanford*, 794 F.3d at 307. Here, the AC further alleges that substantially the same negative information was communicated twice after September 2015—in December 2015 and February 2016.

undisclosed clinical data from Wolverine and Brighton—that the market for PNT2258 could never be as large as described.

These statements, however, are protected forward-looking statements.  *See* 15 U.S.C. § 78u–5(i)(1). ("a projection of revenues, income, [or] earnings," "plans and objectives of management for future operations," and "a statement of future economic performance" are all forward-looking statements).  As with the forward-looking statements about PNT2259 and DNAi addressed earlier, these statements were accompanied by numerous, meaningful cautionary disclosures.  They cannot give rise to liability.

### C.    Disclosure of Protocol Amendments

Plaintiffs devote much of the AC to defendants' non-disclosure of the various protocol amendments discussed above.  There is, of course, no general duty to update investors on the progress of a clinical trial.  *See, e.g.*, *In re All. Pharm. Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 189 (S.D.N.Y. 2003).  But the failure to disclose protocol amendments can make affirmative statements about the success of a drug materially misleading.  *Id.* at 189–91.

Even assuming ProNAi was required to disclose the protocol amendments to make its statements about PNT2258's efficacy (reviewed earlier) not materially misleading, plaintiffs still cannot prevail on this theory, because ProNAi made such disclosures.  As demonstrated by Exhibit 11 to the Stokes Declaration, the vast majority of the protocol amendments at issue were promptly disclosed on the Clinical Trials website.  That governmental website, which plaintiffs cite repeatedly in the AC, is effectively incorporated into and/or integral to it.[23]  *See* AC at 19,

---

[23] "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)).

21, 28 n.20, 29 & n.21, 37, 42, 43 n.32; *see also Abely v. Aeterna Zentaris Inc.*, No. 12 CIV. 4711 PKC, 2013 WL 2399869, at *22 (S.D.N.Y. May 29, 2013) ("[I]t is appropriate to review the versions of the studies' designs as published and available online through the National Institutes for Health at ClinicalTrials.gov.").

Where cognizable materials reveal a public disclosure, the Court is not required to blink reality and accept as true a plaintiff's claim of non-disclosure. *See, e.g.*, *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013) ("A plaintiff who alleges that he was deceived by an advertisement may not misquote or misleadingly excerpt the language of the advertisement in his pleadings and expect his action to survive a motion to dismiss."). Such is the case here. The claim in the AC that the protocol amendments went undisclosed is flatly refuted by the contents of a website on which the AC relies. Defendants' public reporting of the protocol amendments precludes the AC's claim of a nondisclosure rendering other statements actionably misleading. *See In re AIG Advisor Grp. Sec. Litig.*, 309 Fed. App'x 495, 498 (2d Cir. 2009) (where plaintiff alleged omissions in SEC filings, "website disclosures made by the [defendant] that detailed the allegedly undisclosed [information] . . . rendered inactionable the alleged misrepresentations or omissions"); *accord Wilbush v. Ambac Fin. Grp., Inc.*, 271 F. Supp. 3d 473, 489 (S.D.N.Y. 2017) (citing *In re AIG*); *see also Abely*, 2013 WL 2399869, at *14 (no liability because of, *inter alia*, the fact that "the alteration of the primary endpoint was made publicly and contemporaneously, as was the addition of a third secondary endpoint").

**D.  Statements Regarding Registration-Oriented Clinical Development Strategy**

ProNAi made many statements to the effect that it was pursuing a registration-oriented

clinical development strategy. [24]  The following are representative:

- "We have conducted two clinical trials with PNT2258 to date: a Phase 1 safety
  trial in patients with relapsed or refractory solid tumors and a Phase 2 trial in
  patients with relapsed or refractory non-Hodgkin's lymphoma (NHL).  Having
  observed preliminary evidence of efficacy and tolerability, we plan to pursue a
  broad registration-oriented clinical development program, initially in hematologic
  malignancies, that we anticipate will provide the foundation of a global
  registration strategy for PNT2258."  MS7, MS22, MS25, MS50, MS63.[25]

- The Company is pursuing a "multi-faceted clinical development strategy that is
  designed to efficiently achieve regulatory approval and maximize the commercial
  opportunity of PNT2258."  MS16, MS23, MS50, MS67.

Plaintiffs claim that because the clinical trial's study design and protocol amendments were, in

various ways, contrary to FDA recommendations, ProNAi's statements that it was pursuing a

registration-oriented strategy were actionably misleading.

That claim fails for several reasons.  First, ProNAi's Prospectus disclosed at the start of

the Class Period many of the design features of which plaintiffs complain.  For example, the

Prospectus made clear that the Phase 1 study, Pilot Phase 2 study, Wolverine, and Brighton were

all open-label.  Prospectus at 88, 91, 92.  Likewise, as noted, ProNAi disclosed the protocol

amendments on ClinicalTrials.gov.  Whatever plaintiffs' critique of the design of ProNAi's

studies, plaintiffs cannot claim that these amply disclosed design features were kept from the

public.  *See In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 397 (S.D.N.Y.

---

[24] The registration-related alleged misstatements include the following:  MS7, MS8, MS9, MS16,
MS18, MS19, MS23, MS25, MS26, MS28, MS32, MS37, MS40, MS42, MS47, MS50, MS51,
MS61, MS63, and MS67.

[25] This is also a protected forward-looking statement.

2010) (statements from prospectus and company website "demonstrate that '[t]he "total mix" of available information included the very information plaintiffs claim was concealed,'" and thus were not actionable) (citation omitted), *aff'd sub nom. Wilson v. Merrill Lynch & Co.*, 671 F.3d 120 (2d Cir. 2011). ProNAi also warned that it had not discussed its trial design with the FDA and might not, therefore, have the benefit of the FDA's current thinking as to trial design. *See* Prospectus at 15.

This Court's decision dismissing § 10(b) claims against a pharmaceutical concern in *Sanofi I*, and the Second Circuit's decision in *Sanofi II* affirming that dismissal, are instructive as to these points. The FDA there had repeatedly noted its concern about the single-blind design that Sanofi had chosen for certain clinical trials of the drug Lemtrada, and had suggested that such a design "will cause serious difficulties in interpreting the results of the trial" and that "extremely robust findings will be necessary to overcome these issues." *Sanofi I*, 87 F. Supp. 3d at 520. Sanofi had disclosed the fact that its trials were single-blind, but not that the FDA had expressed concern that such a design would heighten the showing required for Sanofi to obtain approval. *Id.* Sanofi had also repeated statements reflecting optimism about Lemtrada's efficacy results and approval prospects.

In dismissing plaintiffs' § 10(b) claims, this Court noted that Sanofi had disclosed to investors that its studies were single blind and that the FDA's preference for double-blind studies was well known. Where a company has disclosed the single-blind nature of its study, the Court noted, "a reasonable investor [has] reason to know that the design of the [clinical trials at issue] [falls] short of the FDA gold standard." *Id.* at 540. "Such an investor could reasonably infer that the study design might impede or delay FDA approval" of the drug. *Id.*; *see also Sanofi II*, 816 F.3d at 213 ("Especially where a complex financial instrument whose value is tied to FDA

approval is involved, investors may be expected to keep themselves apprised of the FDA's public position on testing methodology.")  Sanofi's optimistic statements about Lemtrada's efficacy and prospects for approval were, thus, not materially misleading despite the company's non-disclosure of the FDA's cautionary, even negative, feedback.

To be sure, there are factual differences between that case and this.  The challenged statements differ in that Sanofi's addressed efficacy and the possibility of regulatory approval whereas ProNAi's addressed its registration-oriented clinical development strategy.  And in *Sanofi*, the FDA's guidance was undisclosed, whereas here there is no claim of undisclosed negative FDA feedback.  But, for plaintiffs, these differences do not helpfully distinguish *Sanofi*.  And the central insights in *Sanofi I* and *II* equally apply: that reasonable investors cannot be assumed to misunderstand the implications of publicly disclosed study-design information, including the implications of deviations from the FDA's publicly expressed views as to optimal study design.  Here, ProNAi accurately disclosed that its clinical trials were open label and that they had been amended, both contrary to FDA's statements as to best practices.  The public was therefore on notice of these matters.  ProNAi's statements were thus not materially misleading.[26]

Plaintiffs also cast as misstatements three other statements by ProNAi about its planned clinical trial development of PNT2258 that do not fit neatly in the aforementioned categories of misstatements.  These statements made representations about ProNAi's plans at the time for the drug.  Specifically:

---

[26] Plaintiffs emphasize that some patients with two prior lines of therapy were excluded from the Wolverine trial due to protocol amendments.  This, they argue, made misleading ProNAi's claim that Wolverine was designed to study "third-line relapsed or refractory DLBCL."  MS47 & MS62.  But these amendments were disclosed and other patients with two or more prior lines of treatment remained in the study population.  The omission of this detail does not support a claim of a material omission.

- "Wolverine has also been designed to identify patient responders according to the genetics of their DLBCL cancer cells, specifically the cell-of-origin sub-type (germinal center B-cell (GCB) vs. activated B-cell (ABC)), as these patients tend to differ in their prognoses and response to medical treatment. Since BCL2 is overexpressed in both sub-types, PNT2258 may be active in both types of disease, which could potentially differentiate our drug versus certain other therapeutics in common use or in development that only demonstrate activity in one sub-type." MS43.

- "We anticipate reporting initial interim data from the Wolverine trial in third-line DLBCL in the second quarter of 2016. This trial has been designed to identify and characterize patient populations who respond to PNT2258 on the basis of their genetics and disease characteristics and will be essential to determining potential paths to registration for the drug. We recently started enrolling the Brighton trial in Richter's transformation and expect to report interim data from this trial before the end of 2016. We are also designing a number of additional Phase 2 trials that could support the registration and commercialization strategies for PNT2258. Two planned trials, Cypress and Granite, will evaluate PNT2258 in combination with standard-of-care treatment regimens for the treatment of second-line DLBCL in the 'transplant eligible' and 'transplant ineligible' patient populations respectively." MS62.

- "During the first quarter, we continued to advance our lead cancer drug, PNT2258, in two Phase 2 trials, Wolverine and Brighton, and we remain on track to report interim data from the Wolverine trial in third-line diffuse large B-cell lymphoma (DLBCL) in June 2016." MS66.

Plaintiffs fail, however, to identify any untrue or misleading aspects of these essentially factual statements. The do not, for example, allege that the Wolverine trial did not include patients with both GCB and ABC subtypes of DLBCL or that ProNAi was not, in fact, intending to start the Cypress and Granite trials. Quite the contrary, as of May 10, 2016, the date of the statement in MS66, ProNAi was conducting both the Wolverine and Brighton trials, and ProNAi did, in fact, report the results of Wolverine in June 2016. Absent a well-pled claim of falsity or of a material omission, these statements are not actionable.

### E. Statements Regarding ProNAi's Internal Controls

Plaintiffs next assail several statements by ProNAi, starting in November 2015, to the effect that its internal compliance measures had previously had material weaknesses but that

56

ProNAi had implemented disclosure-control procedures to rectify those weaknesses. *See* MS29, MS30, MS59, MS60, MS69, MS70. Plaintiffs similarly attack the Section 302 Sarbanes-Oxley certifications by Glover and Jagpal.

But plaintiffs do not explain why these were actionable misstatements. Instead, in a perfunctory fashion in a footnote, plaintiffs state that such statements are false and misleading "for the reasons stated herein." Pl. Br. at 18 n.14. The AC and plaintiffs' brief instead focus on ProNAi's development of PNT2258. They are effectively silent as to ProNAi's internal control processes, let alone how these were misleadingly described. The Court rejects these as bases for a § 10(b) claim.

## F. Scienter

Recapping the foregoing, the Court has found only one set of statements materially misleading: ProNAi's non-forward-looking opinion statements made after September 2015 about the potential novel applications of PNT2258. The Court has held these statements misleading for failure to disclose the universally negative results to date of ProNAi's internal preclinical studies. As to other challenged statements, although not finding these actionable, the Court, solely for the purpose of considering scienter, will also assume *arguendo* that (1) ProNAi's omission of the fact that additional patients discontinued the Pilot Phase II trial made statements about the trial's efficacy materially misleading; and that (2) ProNAi's failure to disclose the disease progression of patients using ProNAi was also actionable. The Court does so because these categories present closer questions than the balance of the 70 statements that plaintiffs put at issue, as to which plaintiffs' challenges fall far short of the mark.

As to any challenged statement, to state a claim, plaintiffs would still need to adequately plead scienter. The AC fails to do so. It does not plausibly allege (or come close to alleging)

that any challenged statement was made with the "intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319 (citation omitted).

As noted, to plead scienter, plaintiffs must adequately allege facts to show either that defendants (1) had "motive and opportunity" to make false or misleading statements or (2) engaged in "conscious misbehavior or recklessness" when they made such statements. *ATSI*, 493 F.3d at 99. "Sufficient motive allegations 'entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged.'" *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (quoting *Novak*, 216 F.3d at 307). "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Id.* That standard is met, for example, when a company's directors have engaged in insider sales during the time they misrepresented the corporation's performance. *See Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir. 1985).

Plaintiffs have not made any such allegation here. Plaintiffs instead suggest that the desires of ProNAi and the defendant executives to have a successful IPO and to raise enough money to purchase another drug candidate if PNT2258 failed provide sufficient motive to infer deliberate dissembling about PNT2258's prospects and the details of the ongoing trials.[27] They do not. Those instead are exactly the sort of generalized "motives" that the courts in this District regularly reject as bases for inferring scienter. *See, e.g.*, *Wyche v. Advanced Drainage Sys., Inc.*, No. 15 CIV. 5955 (KPF), 2017 WL 971805, at *12 (S.D.N.Y. Mar. 10, 2017) (rejecting alleged motive of "raising as much money as possible in connection with the IPO"), *aff'd*, 710 F. App'x

---

[27] Plaintiffs suggest in a footnote to their brief that Glover sold shares during the Class Period. *See* Pl. Br. at 16 n.11. However, that allegation appears nowhere in the complaint.

471 (2d Cir. 2017); *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F. Supp. 2d 277, 295 (S.D.N.Y. 2013) (rejecting alleged motive of "assur[ing] that the company closed on [an] acquisition").

To plead scienter, plaintiffs must therefore meet the "correspondingly greater" burden of pleading recklessness. This, too, plaintiffs fail to do.

Plaintiffs focus their claim of recklessness on the fact that a number of company officials resigned their posts during the Class Period. Without more, that allegation does not suffice to give rise to an inference that it was due to recklessness that ProNAi's statements were actionably incomplete. Officials resign from public companies for many innocuous reasons. These include that better opportunities were available or that personal considerations favored change. It is also axiomatic that nascent companies with uncertain futures are especially prone to turnover. Here, as in numerous other cases, plaintiffs fail to plead facts non-speculatively linking the resignations of corporate personnel to the company's alleged fraud. *See Wyche*, 2017 WL 971805, at *17; *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 545 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446–47 (S.D.N.Y. 2005). Plaintiffs do not, for example, allege in non-conclusory fashion that the persons who resigned were aware of the negative trial outcomes or had concluded that these results bespoke ultimate failure. Only one such individual, as pled, was aware of the poor trial results, Chief Medical Officer Messmann, *see* AC at 47 and 48. And plaintiffs do not allege that Messman's resignation was interpreted by Glover or others as a harbinger of inevitable failure, or that Messman had any hand in (or objection to) the specific statements by ProNAi that the AC

assails as misleading.[28]  Messman's resignation could certainly bespeak pessimism as to

PNT2258's prospects, but that would not reveal scienter on his part or his colleagues.  *See*

*Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003) ("[T]he successive resignations of

key officials, as the district court stated, is more likely probative only of the fact that the

company was failing."); *In re PXRE*, 600 F. Supp. 2d at 545 (citing *Rosenweig*); *In re BISYS*,

397 F. Supp. 2d at 447 n.85 (S.D.N.Y. 2005) (same); *see also Stambaugh v. Corrpro Cos., Inc.*,

116 Fed. App'x 592, 598 (6th Cir. 2004) (most plausible inference is that resignations were

result of long period of corporate mismanagement rather than fraud).  And, even if it were

probative, this one resignation would not be sufficient, by itself, to establish corporate scienter.

*See In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007)

(resignation of two individuals, one of whom was a named defendant, can add to overall

circumstantial evidence of fraud, but is not sufficient, by itself, to establish fraud).

Plaintiffs alternatively found their claim of scienter on the fact that PNT2258 was "core"

to ProNAi's business.  But "while the [core operations] inference may be considered as part of [a

court's] holistic assessment of the scienter allegations, it is not independently sufficient to raise a

strong inference of scienter."  *Shemian v. Research In Motion Ltd.*, No. 11 CIV. 4068 RJS, 2013

WL 1285779, at *18 (S.D.N.Y. Mar. 29, 2013), *aff'd*, 570 F. App'x 32 (2d Cir. 2014).  The

Court instead must consider this fact in combination with each of the three alleged misstatements

that the Court has found either plausibly pled or tolerably close, so as to gauge whether the

inference of scienter is "*at least as compelling* as any opposing inference one could draw from

---

[28] Plaintiffs do allege, generally, that Messman wanted ProNAi to stop calling itself a DNAi company because, as plaintiffs put it, "DNAi was not real."  AC at 16.  However, plaintiffs never allege that Messman's subjective belief could be imputed to ProNAi.

the facts alleged." *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (emphasis in original).

Considering first the non-disclosure that additional patients discontinued the Pilot Phase II trial until January 2016, the Court holds that that fact does not support an inference of scienter. Plaintiffs theorize that ProNAi concealed that fact to enhance its prospects of acquiring new drug candidates in lieu of the doomed PNT2258. But plaintiffs do not substantiate this conclusory claim with concrete factual allegations. And in any event, ProNAi did not acquire its successor drug candidate, AS-141, until after May 26, 2016. Plaintiffs' theory that ProNAi deliberately concealed negative information about PNT2258 to buy time to acquire an alternative drug does not explain why it would disclose that information some four months before it closed on a deal to acquire AS-141.

Considering next the failure to disclose disease progression data—that patients in the Pilot Phase II trial had experienced disease progression PNT2258 at a faster rate than on prior treatments—that fact, too, does not support an inference of scienter. That is so for two reasons. First, plaintiffs cannot merely claim, without a concrete factual basis, that ProNAi had access to this comparative data, *Abely*, 2013 WL 2399869, at *19; they must instead identify the "reports or statements containing this information," *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (citation omitted); *see also Novak*, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information"); *In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.*, No. 14-CV-4471 (KMW), 2016 WL 922711, at *7 (S.D.N.Y. Mar. 7, 2016); *Pehlivanian v. China Gerui Advanced Materials Grp., Ltd.*, 153 F. Supp. 3d 628, 653 (S.D.N.Y. 2015). "An allegation that a defendant merely ought to have

61

known is not sufficient to allege recklessness." *In re China Mobile*, 2016 WL 922711, at *7 (quoting *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 184 (S.D.N.Y. 2012)); *accord Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001). Plaintiffs here have not pointed to any such materials putting ProNAi on notice of the relative disease progressions that it did not disclose. Second, even assuming ProNAi had such notice, it is not evident that ProNAi had a duty to disclose such comparative data; the Court has not found any authority to that effect. Without a clear duty to disclose or factual allegations as to the decision not to disclose such information, there is no reason to infer that the lack of disclosure of these details was an intentional or reckless act, as opposed to, at most, an errant lapse unaccompanied by scienter. Absent pleadings concretely amplifying on the circumstances under which ProNAi did not report such detail—including that overt attention was given to this issue—this omission cannot be assumed to be have been reckless.

Finally, ProNAi's non-disclosure of its preclinical study data does not, without more, give rise to an inference of scienter on its part or that of the individual defendants. The Court has held that a reasonable investor would have expected to be told, alongside the opinion statements to the effect that PNT2258 had some potential for useful application, that the testing to date had come up negative. But the scienter issue—whether the non-disclosure of this fact was a reckless act or merely an errant one—is different. For several reasons, an inference of recklessness does not arise here.

First, as noted, the AC pleads that only a subset of this testing data was conveyed to Glover—none, as pled, was communicated to CFO Jagpai. *See Wyche*, 2017 WL 971805, at *15 (declining to infer scienter when concerns not communicated to individual defendants), *aff'd*, 710 F. App'x at 473 (same); *City of Austin Police*, 957 F. Supp. 2d at 299 (same).

Second, and more important, the AC does not plead any facts to suggest that—until the actual termination of PNT2258's development at the end of the Class Period—Glover, Jagpai, or someone else whose intent could be imputed to ProNAi subjectively believed that PNT2258 had ceased to have promise or should be abandoned. Absent such factual allegations, defendants' qualified opinion statements reciting that there was some promise for ProNAi in novel applications must be viewed as reflecting sincerely held views. Notably, even the CWs on whom the AC relies are not claimed to have given up hope as to PNT2258 at these points. The AC alleges only that CW-1 conveyed to Glover and others at the September 2015, December 2015, and February 2016 meetings that the preclinical trials to date had not shown the drug to be effective.[29] And the AC does not plead any facts suggesting a personal motive by any defendant to conceal the preclinical data. There is, for example, no pleading of an intention by an individual defendant to sell ProNAi stock before an adverse disclosure drove ProNAi's stock price down. *Cf. Blanford*, 794 F.3d at 307 (finding scienter based on confidential witness testimony where individual defendants had made suspicious stock purchases). And, in fact, the efficacy evidence from the Pilot Phase II trial—that 85% of patients had a complete response, partial response, or stable disease—suggests that Glover had at least some factual basis for his expressed optimism and undermines any circumstantial claim of recklessness. Without more, even if errant under the securities laws, the non-disclosure of these initial negative results by persons who sincerely believed the drug had promise cannot be labeled a reckless act.

Third and finally, the nature of the undisclosed information matters. There is in general no freestanding obligation to disclose preclinical data. And sincerely held statements of opinion

---

[29] Even if the CWs were pled to have contemporaneously given up all hope in PNT2258, "differences of opinion, even stark differences, between employees do not reveal scienter." *City of Austin Police*, 957 F. Supp. 2d at 299.

are rarely actionable (and in this Circuit, were not actionable until the Supreme Court's March 2015 decision in *Omnicare* held that, in unusual cases, omitted facts could make a genuinely held statement of opinion materially misleading). On the unusual circumstances here, the Court has narrowly held that, from September 2015 until the Class Period's end, when ProNAi opined that PNT2258 had some potential novel applications, a duty to disclose the consistently negative preclinical results arose. But it does not follow that a breach of that duty was a reckless act as opposed to an errant lapse. And beyond pleading Glover's notice of the negative preclinical test results, the AC is devoid of any factual allegations supporting a claim of recklessness. That is not enough.

For these reasons, the AC does not adequately plead scienter as to any misstatements at issue.

## G. § 20(a) Claims

Plaintiffs also bring a claim against ProNAi, Jagpal and Glover under § 20(a) of the Exchange Act. AC at 119–20. Such claims can lie only against the individual defendants, as ProNAI is not a controlling person of itself. In any event, to state a claim under § 20(a), plaintiffs must adequately allege "a primary violation by the controlled person." *Carpenter Pension Trust Fund*, 750 F.3d at 236 (quoting *ATSI*, 493 F.3d at 108). Because plaintiffs have not done so, their § 20(a) claim must also be dismissed. *See, e.g.*, *In re Lions Gate Entm't Corp. Sec. Litig.*, No. 14 Civ. 5197 (JGK), 2016 WL 297722, at *18 (S.D.N.Y. Jan. 22, 2016) (dismissing § 20(a) claim based on failure to adequately allege a primary violation).

## CONCLUSION

For the foregoing reasons, the Court dismisses the AC in its entirety, with prejudice. The

Clerk of Court is respectfully directed to terminate the motions pending at docket number 22 and

to close this case.

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: March 13, 2018
      New York, New York

**APPENDIX**

| No. | Source | Alleged False Statement/Misstatement | AC ¶ |
|---|---|---|---|
| | **ProNAi's Actionable Misstatements as Alleged by Plaintiff** | | |
| MS1 | July 15, 2015 —Prospectus | "In a recent single agent Phase 2 trial . . ., PNT2258 demonstrated evidence of efficacy and tolerability [and] the potential to change treatment paradigms across a wide range of oncology indications." | 133 |
| MS2 | July 15, 2015 —Prospectus | "Although not statistically powered for formal efficacy analysis, we believe the preliminary evidence of efficacy observed in this trial, coupled with safety and tolerability data collected to date, suggest that PNT2258 has the potential to change treatment paradigms across a wide range of oncology indications." | 133 |
| MS3 | July 15, 2015 —Prospectus | "[DNAi's] unique mechanism for impacting downstream BCL2 protein levels…could also potentially amplify and be complementary to other therapeutic modalities." | 134 |
| MS4 | July 15, 2015 —Prospectus | "We believe that DNAi technology may be applicable to additional high value genetic targets beyond BCL2 that are also challenging to drug by conventional means. We plan to leverage our DNAi technology platform to generate a pipeline of product candidates that modulate the transcription of oncogenes known to be involved in cancer, and potentially implicated in other diseases." | 135 |
| MS5 | July 15, 2015 —Prospectus | "[O]ur business is highly dependent on the success of our only clinical product candidate, PNT2258. If we are unable to successfully develop, obtain regulatory approval for and commercialize PNT2258, or experience significant delays in doing so, our business will be materially harmed." | 137 |
| MS6 | July 15, 2015 —Prospectus | Pronai will become "a leader in developing and commercializing a broad and diverse portfolio of cancer therapies and deliver therapeutic outcomes that dramatically changed patients' lives." | 139 |
| MS7 | July 15, 2015 —Prospectus | "Having observed preliminary evidence of efficacy and tolerability, we plan to pursue a broad registration-oriented clinical development program, initially in hematologic malignancies, that we anticipate will provide the foundation of a global registration strategy for PNT2258." | 139 |
| MS8 | July 15, 2015 —Prospectus | "Key elements of our business strategy are to: Expedite the Clinical Development and Regulatory Approval of PNT2258. We plan to advance our lead product candidate, PNT2258, in DLBCL and Richter's CLL. . . In December 2014, we initiated Wolverine, a Phase 2 trial for the treatment of third- line relapsed or refractory DLBCL, and by mid-2015, we plan to initiate Brighton, a Phase 2 trial for the treatment of Richter's CL." | 140 |

| | | | |
|---|---|---|---|
| MS9 | July 15, 2015 —Prospectus | "Pursue a Multi-Faceted Development Strategy for PNT2258 Across Many Oncology Indications. In addition to Wolverine and Brighton, we intend to expand the commercial market opportunity for PNT2258 by developing it for the treatment of a wide variety of BCL2-driven tumors, including other hematologic malignancies, such as leukemias and myelomas, as monotherapy and in combination with other therapeutic agents or treatment regimens." | 140 |
| MS10 | July 15, 2015 —Prospectus | "As we further develop PNT2258, we plan to build a commercial infrastructure to directly market in North America and possibly other major geographies that are core to our commercial strategy. We plan to enter into collaborations for the development, marketing and commercialization of PNT2258 in additional geographies at an appropriate time. We also plan to invest in scaling our manufacturing capacity to support our global commercial strategy." | 140 |
| MS11 | July 15, 2015 —Prospectus | "Maintain our Competitive Advantage by Continuing to Invest in our Proprietary DNAi Technology Platform." | 140 |
| MS12 | July 15, 2015 —Prospectus | "Broaden our Pipeline of Novel Product Candidates by Leveraging our Proprietary DNAi Technology Platform. We believe DNAi technology may be applicable to additional high value genetic targets beyond BCL2 that are also challenging to effectively drug by conventional means." | 140 |
| MS13 | July 15, 2015 —Prospectus | "[O]ur technology, knowledge, experience, and scientific resources provide us with competitive advantages." | 141 |
| MS14 | July 15, 2015 —Prospectus | "Since we estimate that BCL2 is expressed in more than 60% of all new cases across the top 10 most commonly diagnosed cancers in the United States, we are also interested in developing PNT2258 for indications beyond DLBCL." | 141 |
| MS15 | July 15, 2015 —Prospectus | "There is a significant opportunity to develop PNT2258 across many oncology indications." | 142 |
| MS16 | July 15, 2015 —Prospectus | The Company is pursuing "a multi-faceted clinical development strategy that is designed to achieve regulatory approval and maximize the commercial opportunity of PNT2258." | 143 |
| MS17 | July 15, 2015 —Prospectus | "We may be required to suspend, repeat or terminate our clinical trials if they are not conducted in accordance with regulatory requirements, the results are negative or inconclusive or the trials are not well designed." | 145 |
| MS18 | August 21, 2015 —Q2 2015 Report | "In a recent single-agent Phase 2 trial of 13 patients with relapsed or refractory non-Hodgkin's lymphoma (NHL), PNT2258 demonstrated evidence of anti- tumor activity…we believe the preliminary evidence of efficacy observed in this trial, coupled with safety and tolerability data collected to date, suggest that PNT2258 has the potential to change treatment paradigms across a wide range of oncology indications. Accordingly, we plan to pursue a broad registration oriented clinical development program, initially in hematologic malignancies, that we anticipate will provide the foundation of a global registration strategy for PNT2258." | 149 |
| MS19 | August 21, 2015 —Q2 2015 Report | "Our business and future success depends on our ability to successfully develop, obtain regulatory approval for and commercialize our only clinical product candidate, PNT2258, which is at an early stage of development." | 151 |

| | | | |
|---|---|---|---|
| MS20 | August 21, 2015 —Q2 2015 Report | "If clinical trials of PNT2258 or future product candidates that we may develop fail to demonstrate safety and efficacy or do not otherwise produce positive results, we may incur additional costs or experience delays in completing, or ultimately be unable to complete, the development and commercialization of PNT2258 or future product candidates." | 151 |
| MS21 | August 21, 2015 —Q2 2015 Report | Pronai would be "a leader in developing and commercializing a broad and diverse portfolio of cancer therapies and deliver therapeutic outcomes that dramatically changed patients' lives." | 153 |
| MS22 | August 21, 2015 —Q2 2015 Report | "We have conducted two clinical trials with PNT2258 to date: a Phase 1 safety trial in patients with relapsed or refractory solid tumors and a Phase 2 trial in patients with relapsed or refractory NHL. Having observed preliminary evidence of efficacy and tolerability, we plan to pursue a broad registration- oriented clinical development program, initially in hematologic malignancies, that we anticipate will provide the foundation of a global registration strategy for PNT2258." | 154 |
| MS23 | August 21, 2015 —Q2 2015 Report | "We are pursuing a multi-faceted clinical development strategy that is designed to efficiently achieve regulatory approval and maximize the commercial opportunity of PNT2258." | 155 |
| MS24 | August 21, 2015 —Q2 2015 Report | "We may be required to suspend, repeat or terminate our clinical trials if they are not conducted in accordance with regulatory requirements, the results are negative or inconclusive or the trials are not well designed." | 157 |
| MS25 | November 5, 2015 —Q3 2015 Report | "We have conducted two clinical trials with PNT2258 to date: a Phase 1 safety trial in patients with relapsed or refractory solid tumors and a Phase 2 trial in patients with relapsed or refractory non-Hodgkin's lymphoma (NHL). Having observed preliminary evidence of efficacy and tolerability, we plan to pursue a broad registration-oriented clinical development program, initially in hematologic malignancies, that we anticipate will provide the foundation of a global registration strategy for PNT2258." | 160 |
| MS26 | November 5, 2015 —Q3 2015 Report | "Our lead DNAi product candidate, PNT2258, targets BCL2, a widely overexpressed oncogene that is an important gatekeeper of the programmed cell death process known as apoptosis and has been linked to many forms of cancer. We are pursuing a multi- faceted clinical development strategy that is designed to efficiently achieve regulatory approval and maximize the commercial opportunity of PNT2258." | 161 |
| MS27 | November 5, 2015 —Q3 2015 Report | "[O]ur business is highly dependent on the success of our only clinical product candidate, PNT2258. If we are unable to successfully develop, obtain regulatory approval for and commercialize PNT2258, or experience significant delays in doing so, our business will be materially harmed." | 163 |
| MS28 | November 5, 2015 —Q3 2015 Report | "We may be required to suspend, repeat or terminate our clinical trials if they are not conducted in accordance with regulatory requirements, the results are negative or inconclusive or the trials are not well designed." | 165 |

| | | | |
|---|---|---|---|
| MS29 | November 5, 2015 —Q3 2015 Report | "[O]ur Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of September 30, 2015 to ensure that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely discussion regarding required disclosures." | 167 |
| MS30 | November 5, 2015 —Q3 2015 Report | "We have implemented changes to our disclosure controls and procedures and internal control over financial reporting to remediate the material weakness identified above. We have strengthened the operation of our internal controls over the accounting for non-routine, complex transactions, including increasing the depth and experience within our accounting and finance organization, as well as designing and implementing improved processes and internal controls to identify such matters. We have hired additional personnel to build our financial management and reporting infrastructure, including a Chief Financial Officer. We believe that the remediation initiative outlined above was sufficient to remediate the material weakness in internal control over financial reporting as discussed above." | 168 |
| MS31 | November 19, 2015 Presentation | "Investment highlights" on page 1: "Novel platform with pipeline potential: Pioneering a novel class of therapeutics based on our proprietary DNA interference (DNAi) platform focused on high value genetic targets in oncology. Phase 2 asset targeting BCL2 oncogene: Clinical data to date for lead product candidate, PNT2258, demonstrates single agent efficacy and durability with a well-tolerated safety profile." | 172 |
| MS32 | November 19, 2015 Presentation | "Multiple, meaningful data catalysts: Planned initiation of six Phase 2 trials of PNT2258, beginning with third line relapsed or refractory DLBCL and Richter's transformed CLL, with multiple clinical readouts anticipated over the next 12-24 months." | 173 |
| MS33 | November 19, 2015 Presentation | "Broad commercial potential as mono-/combo- therapy: BCL2 implicated in broad range of hematological malignancies and solid tumors. Augmentation of apoptotic signaling via BCL2 with a well-tolerated agent may lead to numerous combination options." | 173 |
| MS34 | November 19, 2015 Presentation | PNT2258 has "[s]ignificant commercial potential: BCL2 expressed in ~60% of top 10 cancers," and the Company is pursuing a "broad registration oriented development strategy for PNT2258" which included "additional combination and monotherapy trials planned for 2016 [and] a long-term strategy to maximize global commercial value, include sold tumors." | 174 |
| MS35 | November 19, 2015 Presentation | The Company's "unique and distinct" DNAi technology "allow[s] for a more profound impact on oncogenic targets" and is "complementary to other therapeutic approaches." | 175 |
| MS36 | January 14, 2016 Presentation | "[I]nvestment highlights" of the presentation: "Clinical data: In pilot Phase 2 study, PNT2258, demonstrates single agent efficacy and durability with a well-tolerated safety profile… | 178 |

| | | | |
|---|---|---|---|
| MS37 | January 14, 2016 Presentation | Multiple, meaningful data catalysts: Planned initiation of six Phase 2 trials of PNT2258, beginning with third line relapsed or refractory DLBCL and Richter's transformed CLL, with multiple clinical readouts anticipated over the next 24 months… | 178 |
| MS38 | January 14, 2016 Presentation | Broad commercial potential as mono-/combo- therapy: BCL2 implicated in broad range of hematological malignancies and solid tumors. Augmentation of apoptotic signaling via BCL2 with a well-tolerated agent may lead to numerous combination options | 178 |
| MS39 | January 14, 2016 Presentation | Novel platform: Potential for a pipeline of novel therapeutics based on proprietary DNA interference (DNAi) platform focused on high value genetic targets in oncology." | 178 |
| MS40 | January 14, 2016 Presentation | PNT2258's "[s]ignificant commercial potential," including "four additional combination and monotherapy trials planned for 2016 [and] a long-term strategy to maximize global commercial value, include sold tumors." | 179 |
| MS41 | March 3, 2016 —2015 Annual Report | "In a recent single-agent Phase 2 trial of 13 patients with relapsed or refractory non-Hodgkin's lymphoma (NHL), PNT2258 demonstrated evidence of anti- tumor activity…we believe the preliminary evidence of efficacy observed in this trial, coupled with safety and tolerability data collected to date, suggest that PNT2258 has potential in the treatment of a variety of oncology indications." | 182 |
| MS42 | March 3, 2016 —2015 Annual Report | "We expect that the results of this trial may ultimately be used to design a subsequent registration trial." | 183 |
| MS43 | March 3, 2016 —2015 Annual Report | "Wolverine has also been designed to identify patient responders according to the genetics of their DLBCL cancer cells, specifically the cell-of-origin sub-type (germinal center B-cell (GCB) vs. activated B-cell (ABC)), as these patients tend to differ in their prognoses and response to medical treatment. Since BCL2 is overexpressed in both sub-types, PNT2258 may be active in both types of disease, which could potentially differentiate our drug versus certain other therapeutics in common use or in development that only demonstrate activity in one sub-type." | 184 |
| MS44 | March 3, 2016 —2015 Annual Report | "[O]ur business is highly dependent on the success of our only clinical product candidate, PNT2258. If we are unable to successfully develop, obtain regulatory approval for and commercialize PNT2258, or experience significant delays in doing so, our business will be materially harmed:" | 186 |
| MS45 | March 3, 2016 —2015 Annual Report | Pronai is poised to become "a leader in developing and commercializing a broad and diverse portfolio of cancer therapies and deliver therapeutic outcomes that dramatically changed patients' lives." | 188 |
| MS46 | March 3, 2016 —2015 Annual Report | "Key elements of our business strategy are to: Expedite the Clinical Development and Regulatory Approval of PNT2258. We plan to advance our lead product candidate, PNT2258, for the treatment of several hematologic malignancies, initially focusing on indications where we believe PNT2258 has demonstrated anti-tumor activity and where there are significant unmet medical needs. The first two indications we plan to pursue are in DLBCL and Richter's CLL. | 188 |

| | | | |
|---|---|---|---|
| MS47 | March 3, 2016 —2015 Annual Report | In December 2014, we initiated Wolverine, a Phase 2 trial for the treatment of third-line relapsed or refractory DLBCL, and in October 2015, we initiated Brighton, a Phase 2 trial for the treatment of Richter's CLL. We are also designing a number of additional Phase 2 trials that could support the registration and commercialization strategies for PNT2258. If the data obtained in any of these trials are highly compelling, we plan to discuss accelerated registration paths and other regulatory designations with regulatory agencies… | 188 |
| MS48 | March 3, 2016 —2015 Annual Report | Pursue a Multi-Faceted Development Strategy for PNT2258 Across Many Oncology Indications. In addition to developing PNT2258 for DLBCL and Richter's CLL, we intend to expand the commercial market opportunity for PNT2258 by developing it for the treatment of a wide variety of BCL2- driven tumors, such as leukemias or solid tumors, as monotherapy and in combination with other therapeutic agents or treatment regimens." | 188 |
| MS49 | March 3, 2016 —2015 Annual Report | "We plan to advance our lead product candidate, PNT2258, for the treatment of several hematologic malignancies, initially focusing on indications where we believe PNT2258 has demonstrated anti-tumor activity and where there are significant unmet medical needs. The first two indications we plan to pursue are in DLBCL and Richter's CLL." | 189 |
| MS50 | March 3, 2016 —2015 Annual Report | "We are pursuing a multi-faceted clinical development strategy that is designed to achieve regulatory approval and maximize the commercial opportunity of PNT2258. We have conducted two clinical trials with PNT2258 to date: a Phase 1 safety trial in patients with relapsed or refractory solid tumors and a Phase 2 trial in patients with relapsed or refractory NHL. Having observed preliminary evidence of efficacy and tolerability, we plan to pursue a broad registration-oriented clinical development program, initially in hematologic malignancies, that we anticipate will provide the foundation of a global registration strategy for PNT2258." | 190 |
| MS51 | March 3, 2016 —2015 Annual Report | [T]he "primary goal of our clinical development strategy is to exploit the full commercial potential of PNT2258 by developing the product candidate in earlier lines of therapy in DLBCL and additional indications, either as monotherapy or in combination with other therapeutic agents or treatment regimens. Specifically, we believe that PNT2258 could also potentially amplify and be complementary to other therapeutic modalities." In light of this "primary goal" the Company reiterated that it planned "to initiate additional Phase 2 trials with PNT2258 in combination with other therapeutic agents or treatment regiments" and "plan to discuss accelerated registration paths and other regulatory designations with regulatory agencies. | 191 |

| | | | |
|---|---|---|---|
| MS52 | March 3, 2016 —2015 Annual Report | "Since BCL2 resides at a key node of the apoptotic pathway, there is a scientific rationale to enhance the apoptotic signal with the addition of PNT2258 to these targeted therapies. We believe there is a strong scientific rationale to suggest that targeting BCL2 could be clinically beneficial in combination with a targeted therapy and may initiate a Phase 2 combination trial of PNT2258 in combination with a targeted therapy…We may initiate a trial to test the potential efficacy of PNT2258 as a single agent in the treatment of one or more other hematological malignancies." | 192 |
| MS53 | March 3, 2016 —2015 Annual Report | "DNAi technology may be applicable to additional high value genetic targets beyond BCL2 that are also challenging to drug by conventional means." | 193 |
| MS54 | March 3, 2016 —2015 Annual Report | "We may be required to suspend, repeat or terminate our clinical trials if they are not conducted in accordance with regulatory requirements, the results are negative or inconclusive or the trials are not well designed." | 195 |
| MS55 | March 3, 2016 —2015 Annual Report | Section 302 SOX Certification executed by Defendant Glover | 198 |
| MS56 | March 3, 2016 —2015 Annual Report | Section 302 SOX Certification executed by Defendant Jagpal | 199 |
| MS57 | March 3, 2016 —2015 Annual Report | Section 906 SOX Certification executed by Defendant Glover | 200 |
| MS58 | March 3, 2016 —2015 Annual Report | Section 906 SOX Certification executed by Defendant Jagpal | 201 |
| MS59 | March 3, 2016 —2015 Annual Report | "As of December 31, 2015, our management, with the participation of our Chief Executive Officer and Chief Financial Officer, performed an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act. Our disclosure controls and procedures are designed to ensure that information required to be disclosed in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission's rules and forms, and that such information is accumulated and communicated to our management, including the Chief Executive Officer and the Chief Financial Officer, to allow timely decisions regarding required disclosures. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2015, the design and operation of our disclosure controls and procedures were effective at a reasonable assurance level." | 203 |

| | | | |
|---|---|---|---|
| MS60 | March 3, 2016 —2015 Annual Report | "As a public company, we incur significant legal, accounting and other expenses that we did not incur as a private company. The Sarbanes-Oxley Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the listing requirements of the stock exchange upon which our common stock is listed and other applicable securities rules and regulations impose various requirements on public companies, including establishment and maintenance of effective disclosure and financial controls and corporate governance practices. Our management and other personnel devote a substantial amount of time to these compliance initiatives… To achieve compliance with Section 404 within the prescribed period, we will be engaged in a process to document and evaluate our internal control over financial reporting, which is both costly and challenging. In this regard, we will need to continue to dedicate internal resources, potentially engage outside consultants and adopt a detailed work plan to assess and document the adequacy of internal control over financial reporting, continue steps to improve control processes as appropriate, validate through testing that controls are functioning as documented and implement a continuous reporting and improvement process for internal control over financial reporting." | 204 |
| MS61 | March 3, 2016 Press Release | "During 2015, we continued to transform ProNAi into a world-class oncology drug development company, securing both the talent and capital required to pursue our vision of developing and commercializing a pipeline of promising clinical-stage oncology assets with the potential to provide meaningful therapeutic outcomes to patients with cancer. Concurrent with building our company, we continued to advance our lead asset PNT2258, operationalizing two Phase 2 trials in 2015, Wolverine and Brighton, that are at the forefront of a concerted registration oriented clinical development program planned for the drug. In addition to PNT2258, during 2015 we began evaluating novel product candidates available for licensing or acquisition, with the goal of maximizing our clinical development capabilities and leveraging the full potential of our team by advancing a broad and diversified pipeline of assets. | 206 |
| MS62 | March 3, 2016 Press Release | We anticipate reporting initial interim data from the Wolverine trial in third-line DLBCL in the second quarter of 2016. This trial has been designed to identify and characterize patient populations who respond to PNT2258 on the basis of their genetics and disease characteristics and will be essential to determining potential paths to registration for the drug. We recently started enrolling the Brighton trial in Richter's transformation and expect to report interim data from this trial before the end of 2016. We are also designing a number of additional Phase 2 trials that could support the registration and commercialization strategies for PNT2258. Two planned trials, Cypress and Granite, will evaluate PNT2258 in combination with standard-of-care treatment regimens for the treatment of second-line DLBCL in the "transplant eligible" and "transplant ineligible" patient populations respectively. We are also designing trials evaluating PNT2258's potential in DLBCL in combination with a targeted anti-cancer drug, and in other hematological malignancies as well." | 206 |

| | | | |
|---|---|---|---|
| MS63 | May 10, 2016 —1Q 2016 Report | "We have conducted two clinical trials with PNT2258 to date: a Phase 1 safety trial in patients with relapsed or refractory solid tumors and a Phase 2 trial in patients with relapsed or refractory non-Hodgkin's lymphoma (NHL). Having observed preliminary evidence of efficacy and tolerability, we plan to pursue a broad registration-oriented clinical development program, initially in hematologic malignancies, that we anticipate will provide the foundation of a global registration strategy for PNT2258." | 210 |
| MS64 | May 10, 2016 —1Q 2016 Report | "Our business and future success depends on our ability to successfully develop, obtain regulatory approval for and commercialize our only clinical product candidate, PNT2258, which is at an early stage of development… | 212 |
| MS65 | May 10, 2016 —1Q 2016 Report | … If clinical trials of PNT2258 or future product candidates that we may develop fail to demonstrate safety and efficacy or do not otherwise produce positive results, we may incur additional costs or experience delays in completing, or ultimately be unable to complete, the development and commercialization of PNT2258 or future product candidates." | 212 |
| MS66 | May 10, 2016 —1Q 2016 Press Release | "During the first quarter, we continued to advance our lead cancer drug, PNT2258, in two Phase 2 trials, Wolverine and Brighton, and we remain on track to report interim data from the Wolverine trial in third- line diffuse large B-cell lymphoma (DLBCL) in June 2016." | 214 |
| MS67 | May 10, 2016 —1Q 2016 Report | Through a "multi-faceted clinical development strategy that is designed to efficiently achieve regulatory approval and maximize the commercial opportunity of PNT2258," the Company would Implement a "global registration strategy for PNT2258." | 216 |
| MS68 | May 10, 2016 —1Q 2016 Report | "We may be required to suspend, repeat or terminate our clinical trials if they are not conducted in accordance with regulatory requirements, the results are negative or inconclusive or the trials are not well designed:" | 218 |
| MS69 | May 10, 2016 —1Q 2016 Report | Our management, with the participation of our Chief Executive Officer and our Chief Financial Officer, have evaluated our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were effective as of March 31, 2016 to ensure that information required to be disclosed by us in the reports we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely discussion regarding required disclosures. | 220 |

| | | | |
|---|---|---|---|
| MS70 | May 10, 2016 —1Q 2016 Report | "There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a- 15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended March 31, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting." | 221 |